Christopher S. SIDWELL, Petitioner,

and

Director, Office of Workers' Compensation Programs, United States Department of Labor, Intervenor,

v.

EXPRESS CONTAINER SERVICES, INCORPORATED, Respondent.

No. 95–1101.

United States Court of Appeals, Fourth Circuit.

Argued: Sept. 25, 1995.

Decided: Dec. 28, 1995.

**ARGUED:** John Harlow Klein, Rutter & Montagna, Norfolk, Virginia, for Petitioner. Joshua Thomas Gillelan, II, Senior Attorney, Office of the Solicitor, United States Department of Labor, Washington, D.C., for Intervenor. F. Nash Bilisoly, IV, Vandeventer, Black, Meredith & Martin, Norfolk, Virginia, for Respondent. **ON BRIEF:** Thomas S. Williamson, Jr., Solicitor of Labor, Carol A. De Deo, Associate Solicitor, Office of the Solicitor, United States Department of Labor, Washington, D.C., for Intervenor.

Before WIDENER and LUTTIG, Circuit Judges, and BEATY, United States District Judge for the Middle District of North Carolina, sitting by designation.

Affirmed by published opinion. Judge LUTTIG wrote the opinion, in which Judge WIDENER joined. Judge BEATY wrote a separate opinion concurring in the judgment.

## OPINION

LUTTIG, Circuit Judge:

Appellant Christopher S. Sidwell was injured at a site eight-tenths of a mile from a ship terminal, while repairing a shipping container. He sought compensation under the Longshore and Harbor Workers' Compensation Act. The ALJ denied Sidwell benefits, finding that the injury did not occur at a situs covered by the Act, and the Department of Labor Benefits Review Board affirmed. We affirm.

### I.

Sidwell was injured on June 11, 1990, while working for his employer, Express Container Services ("ECS"), as a container mechanic at ECS's Chautauqua facility in Portsmouth, Virginia. ECS is in the business of repairing cargo containers and the chassis used to carry them. ECS voluntarily paid Sidwell temporary total disability benefits under the Virginia Workers' Compensation Act from June 12, 1990, through September 14, 1990, as well as medical benefits. J.A. at 78. Sidwell sought additional compensation under the Longshore and Harbor Workers' Compensation Act, 33 U.S.C. § 901 *et seq.* ("LHWCA").

ECS's facility was previously located near the gate of Portsmouth Marine Terminals, where vessels are loaded and unloaded from the Elizabeth River. In 1985, the terminal expanded and purchased ECS's facility, at which time ECS relocated to its present facility eight-tenths of a mile from the terminal. The current location is surrounded by various businesses and residential developments, including a sheet metal shop, a paint contractor, a row of houses, an engraving shop, a heating and air-conditioning contractor, a gas station, a fire station, a container yard, a Nissan-owned storage area, a foundry, a wholesale meat distributor, a painting and sandblasting contractor, a railroad yard, and

a large residential area across the highway. J.A. at 79.

ECS contracts directly with steamship lines and does not have any agreement with the terminal itself or with the Virginia Port Authority. Approximately 90% of the containers and chassis arrive at ECS via inland roads, while the remainder come from the terminal. ECS also performs minor repairs on containers at the terminal site, using mobile trucks. Employees do not ordinarily alternate between the terminal and Chautauqua sites. Sidwell, for example, worked at the Chautauqua site and had not worked at the terminal for over a year prior to his injury at Chautauqua. J.A. at 24–25.

The ALJ denied Sidwell benefits under the LHWCA because he found that the Chautauqua site was not an "adjoining area" under the "functional relationship" test of *Brady–Hamilton Stevedore Co. v. Herron*, 568 F.2d 137 (9th Cir.1978). The Benefits Review Board affirmed in an unpublished *per curiam* opinion, and this appeal followed.[1]

### II.

Before 1972, coverage under the LHWCA "was determined primarily by the traditional 'locality' test of maritime tort jurisdiction." *See generally Humphries v. Director, OWCP*, 834 F.2d 372, 373 (4th Cir.1987), *cert. denied*, 485 U.S. 1028, 108 S.Ct. 1585, 99 L.Ed.2d 900 (1988). Under this test, workers injured on navigable waters were covered under the LHWCA, while those injured on adjoining land, piers, or wharves were covered only by state workmen's compensation laws. *Id.* As a consequence, longshoremen continually walked in and out of LHWCA coverage as they walked up and down the gangplank from ship to shore during the loading and unloading of vessels. S. Rep. 92–1125, 92d Cong., 2d Sess. 12–13 (1972).

In 1972, Congress addressed this problem of alternating coverage by amending the

---

1. The Clerk of this court originally denominated the Director of the Office of Workers' Compensation of the United States Department of Labor as an additional respondent but, in light of *Director, OWCP v. Newport News Shipbuilding & Dry Dock Co.*, — U.S. ——, 115 S.Ct. 1278, 131 L.Ed.2d 160 (1995), and under our circuit precedent in

*I.T.O. Corp. v. Benefits Review Bd.*, 563 F.2d 646, 648 (4th Cir.1977) (*en banc*) (*per curiam*), we dismissed the Director as a party because she was not a real party in interest. We did, however, exercise our discretion to permit the Director to intervene on behalf of the claimant (for whom she was already arguing in her brief).

LHWCA so as to·expand coverage to both navigable waters and "the adjoining land area." *Id.* at 13. In doing so, Congress legislated a "status" requirement and a "situs" requirement, both of which must be satisfied in order for the Board to have jurisdiction to award benefits. The status requirement limits coverage to

> any person engaged in maritime employment, including any longshoreman or other person engaged in longshoring operations, and any harbor worker including a ship repairman, shipbuilder, and ship-breaker. . . .

33 U.S.C. § 902(3). The situs requirement limits coverage to

> [any] injury occurring upon the navigable waters of the United States (including any adjoining pier, wharf, dry dock, terminal, building way, marine railway, or *other adjoining area customarily used by an employer in loading, unloading, repairing, dismantling, or building a vessel* ).

33 U.S.C. § 903(a) (emphasis added).

The ALJ and the Board each found that in this case the situs test was not met, and Sidwell challenges that determination.

### A.

The Supreme Court has not articulated a test for determining what is an "other adjoining area" under the LHWCA.[2] The Court has explained, however, that the requirements of "status" and "situs" are distinct, *Director, OWCP v. Perini North River Assocs.,* 459 U.S. 297, 324 n. 32, 103 S.Ct. 634, 650 n. 32, 74 L.Ed.2d 465 (1983) ("[T]he status requirement is occupational and the situs test is geographic."), and that neither should be read to render the other superfluous, *Herb's Welding, Inc. v. Gray,* 470 U.S. 414, 426, 105 S.Ct. 1421, 1428, 84 L.Ed.2d 406 (1985) ("[T]o classify [claimant's] employment as maritime because he was on a covered situs or in a 'maritime environment' would blur together requirements Congress intended to be distinct. We cannot thus read the status requirement out of the statute."); *see*

*also P.C. Pfeiffer Co. v. Ford,* 444 U.S. 69, 79, 100 S.Ct. 328, 335, 62 L.Ed.2d 225 (1979) ("By understanding the term 'maritime employment' to embody an occupational rather than a geographic concept, we give the two phrases [status and situs] distinct and consistent meanings.").

The courts of appeals have developed essentially three different tests for determining whether an injury occurred on a covered situs. ` The three tests all begin from the premise that the statute does not really mean what it says, namely, that the injury must occur on navigable waters, at an enumerated adjoining location, or at another situs that actually "adjoins" navigable waters and is customarily used in loading, unloading, repairing, dismantling, or building vessels.

The Ninth Circuit in *Brady–Hamilton* reasoned that "the phrase 'adjoining area' should be read to describe a functional relationship that does not in all cases depend upon physical contiguity," 568 F.2d at 141. Under this test, whether an area adjoins navigable waters requires an examination of at least four factors, none of which necessarily even relates to whether the area is, in the words of the statute, "adjoining navigable waters." These factors,"among others," are,

> [1] the particular suitability of the site for the maritime uses referred to in the statute; [2] whether adjoining properties are devoted primarily to uses in maritime commerce; [3] the proximity of the site to the waterway; and [4] whether the site is as close to the waterway as is feasible given all of the circumstances in the case.

*Id.* In *Sea–Land Service, Inc. v. Director, OWCP,* 540 F.2d 629 (3d Cir.1976), a decision the Supreme Court has criticized as appearing to "essentially discard[ ] the situs test," *Northeast Marine,* 432 U.S. at 277 n. 40, 97 S.Ct. at 2364 n. 40, the Third Circuit held that "[a]s long as the employment nexus (status) with maritime activity is maintained, the federal compensation remedy should be available[, because] [r]esuscitating the situs requirement in cases satisfying the status test [would] interfere with Congress' inten-

---

**2.** The Court held in *Northeast Marine Terminal Co. v. Caputo,* 432 U.S. 249, 279–81, 97 S.Ct. 2348, 2365–66, 53 L.Ed.2d 320 (1977), that a

terminal that entirely adjoined the water was a covered situs, but a terminal is a situs expressly enumerated in the statute.

tion to eliminate the phenomenon of shifting coverage." [3]  540 F.2d at 638. And in *Texports Stevedore Co. v. Winchester*, 632 F.2d 504 (5th Cir.1980) (*en banc*), *cert. denied*, 452 U.S. 905, 101 S.Ct. 3031, 69 L.Ed.2d 406 (1981), the Fifth Circuit *en banc* likewise effectively eliminated the situs requirement in favor of a case-by-case, "broad and nebulous" inquiry, *id.* at 518 (Tjoflat, J., dissenting), that affords coverage as long as there is "some nexus with the waterfront":

> [W]e ... reject the idea that Congress intended to substitute for the shoreline another hard line. Growing ports are not hemmed in by fence lines; the Act's coverage should not be either. All circumstances must be examined. Nevertheless, outer limits of the maritime area will not be extended to extremes. We would not extend coverage in this case to downtown Houston. The site must have some nexus with the waterfront.

632 F.2d at 514.

Our circuit has considered the issue twice. In *Newport News Shipbuilding & Dry Dock Co. v. Graham*, 573 F.2d 167 (4th Cir.), *cert. denied*, 439 U.S. 979, 99 S.Ct. 563, 58 L.Ed.2d 649 (1978), we held in a one-paragraph discussion, "without purporting to offer a comprehensive test," *see Humphries*, 834 F.2d at 374, that two sites, a submarine shop and a foundry, 1200 feet and 3000 feet from the water's edge respectively, satisfied the situs test because they were both "integral parts of the shipyard." *Graham*, 573 F.2d at 169.

Then, in *Humphries*, we held that the situs requirement was not met when a ship fore-

man was injured in a car accident one and one-half miles from the terminal as he was bringing food for his workers back from a restaurant. In that case, we considered each of the three above-described tests. We rejected *Sea–Land* as "unacceptable" because it "effectively reads the explicit situs requirement out of the Act." 834 F.2d at 374. We characterized *Texports* as "an opinion which struggled bravely with the issue, [and] ended up with little more than a litany of factors which are *not* conclusive in a situs determination—absolute contiguity with navigable waters, fence lines, local designations of the area, exclusive use for maritime purposes, and so on." *Id.* We noted that *Brady–Hamilton* "at first glance at least seem[ed] a more practical approach" than the other tests advanced. *Id.* But ultimately we did not even decide the case under *Brady–Hamilton*. Instead, we expressly declined to "ventur[e] ... a touchstone for all future LHWCA jurisdictional questions" and simply recited a number of factors which, in "combination," rendered the accident outside a maritime situs. *Id.* at 375.

It is against this backdrop that we now decide how it should be determined in this circuit whether the situs requirement of the LHWCA is satisfied.

## B.

Sidwell argues that we should adopt the expansive approach of *Texports*, the Director urges us to embrace what is in effect (although she does not admit it) the even broader formulation of *Sea–Land*,[4] and ECS defends the propriety of the *Brady–Hamilton*

---

3. *See also Sea–Land*, 540 F.2d at 636, 638:

> The line delimiting the outer reaches of the Act's extended coverage is, we think, functional and not spatial. ... It is the situs of the vessels in maritime commerce, not the situs of their maritime employees at the time of injury, that in our view Congress referred to by its reference to navigable waters. ... The limits of federal coverage is [sic] defined not by reference to a geographic relationship with the navigable waters of the United States, but by the location of the interface between the air[,] land and the water modes of transportation. If that interface is customarily located at some point remote from the pier, the fact that the stevedore uses public streets to move the cargo to

or from a "terminal," a "building" or "other adjoining area" does not affect coverage. The key is the functional relationship of the employee's activity to maritime transportation, as distinguished from such land-based activities as trucking, railroading or warehousing.

4. The Director, for example, argues that maritime use should be a "strong" indication of situs, and that the " 'primary' use of surrounding properties and ... the *intervention* of a residential area between the situs of injury and the nearby navigable waters ... *should be incapable as a matter of law of overcoming the fact that a site near the water is used for integrally maritime purposes.*" Br. for the Director, OWCP at 29, 43 (second emphasis added).

multi-factored "functional" test, which the Board applied in this case. Because none of these proffered tests even purports to follow the language of the statute—indeed, for the most part they all openly disavow the statutory text—we decline to adopt any of these tests.

As federal courts, we have repeatedly pledged to Congress that if it would speak clearly in its enacted legislation, we in turn would give effect to that clearly stated intent. In section 903(a), Congress has fulfilled that obligation, just as Justice Kennedy observed it had in section 33(g) of this same statute. *Estate of Cowart v. Nicklos Drilling Co.,* 505 U.S. 469, 484, 112 S.Ct. 2589, 2598, 120 L.Ed.2d 379 (1992) ("Often we have urged the Congress to speak with greater clarity, and in this statute[the LHWCA] it has done so.").[5] Therefore, faithful to our promise, we will interpret the statute as it is written, and as we have been instructed by the Supreme Court to do with respect to this very Act. *See id.*

■ The plain language of the LHWCA requires that covered situses actually "adjoin" navigable waters, not, as the Director maintains, that they merely be in "the general geographic proximity" of the waterfront. *See* Br. of Director, OWCP at 47.[6] Because

Congress did not specify a more technical definition of the word "adjoining" (if that is even possible), we must accord that word its ordinary meaning, *see Will v. Michigan Dep't of State Police,* 491 U.S. 58, 64, 109 S.Ct. 2304, 2308, 105 L.Ed.2d 45 (1989), as, incidentally, the legislative history confirms Congress intended, *see* S. Rep. 92–1125, 92d Cong., 2d Sess. 2 (1972) (emphasis added) ("The bill also expands the coverage of this Act to cover injuries occurring in the *contiguous* dock area related to longshore and ship repair work."). To be sure, dictionaries do include "neighboring" and "in the vicinity of" as possible definitions of "adjoining,"[7] but such is not the ordinary meaning of the word; rather, the ordinary meaning of "adjoin" is "to lie next to," to "be in contact with," to "abut upon," or to be "touching or bounding at some point," *see* WEBSTER'S THIRD NEW INT'L DICTIONARY 27 (1993); *see also* GRANT GILMORE & CHARLES L. BLACK, JR., THE LAW OF ADMIRALTY 424 (2d ed. 1975) (" 'Adjoin' presumably means something like 'border on' or 'have direct access to' navigable waters....."). Accordingly, we hold that an area is "adjoining" navigable waters only if it "adjoins" navigable waters, that is, if it is "contiguous with" or otherwise "touches"

---

**5.** In *Cowart,* the question was whether the claimant, at the time of his third-party settlement, was "a person entitled to compensation" under section 33(g) of the LHWCA, 33 U.S.C. § 933(g), which provides in relevant part that "a person entitled to compensation" forfeits all future benefits if he settles a third party claim without the written approval of his employer. The Court held that, under the plain meaning of "entitlement," a person is entitled to compensation "at the moment his right to recovery vest[s]," even though he has not yet received compensation payments from the employer and has not yet received a judgment in his favor. 505 U.S. at 477. If anything, the meaning of the word "adjoining" is even clearer than the meaning of the word "entitlement," and so Justice Kennedy's observation in *Cowart* applies with at least the same force in the context of section 903(a), which we interpret today:

In a statutory construction case, the beginning point must be the language of the statute, and when a statute speaks with clarity to an issue judicial inquiry into the statute's meaning, in all but the most extraordinary circumstance, is finished.

*Id.* at 475, 112 S.Ct. at 2594.

**6.** That the entire litany ("pier, wharf," etc.) is found in a statutory parenthetical defining "navigable waters" as "including" these areas is further support for interpreting the phrase "other adjoining area[s]" so as to require an immediate geographical nexus with navigable waters.

**7.** The Fifth Circuit in *Texports* relied upon these secondary definitions in order to avoid what it believed to be the unacceptable consequences of a plain meaning interpretation of the statute:

Although "adjoin" can be defined as "contiguous to" or "to border upon," it also is defined as "to be close to" or "to be near." "Adjoining" can mean "neighboring." ... So long as the site is close to or in the vicinity of navigable waters, or in a neighboring area, an employee's injury can come within the LHW[C]A. To require absolute contiguity would be to reenact the hard lines that caused longshoremen to move continually in and out of coverage. It would frustrate the congressional objectives of providing uniform benefits and covering land-based maritime activity.

such waters.[8] If there are other areas between the navigable waters and the area in question, the latter area simply is not "adjoining" the waters under any reasonable definition of that term.

Doubtless realizing that the common-sense definition of "adjoining" is as we have interpreted it, Sidwell and the Director argue, relying on *Texports,* 632 F.2d at 515, that the word "area" is sufficiently broad that the phrase "adjoining area" still covers the site where Sidwell's injury occurred. For example, the Director asserts it is "entirely reasonable" to consider the whole city of Norfolk or Portsmouth to be an "other adjoining area" to navigable waters. Br. for the Director, OWCP at 46. She presumably would be forced to agree as well, at least in principle, that the entire Commonwealth of Virginia is also an "area" adjoining navigable waters.

If we were required to define "area" in the abstract, we might well have to accept the Director's position, because it is indeed true in some sense that every location imaginable is within a larger area that ultimately adjoins some navigable waters. But the word "area" does not appear in the statute in isolation; rather, it is preceded by the words "other adjoining." The statute specifies that coverage extends to injuries sustained on "any adjoining pier, wharf, dry dock, terminal, building way, marine railway, *or other adjoining area* . . . ." To define "area" without reference to this language of qualification, is

to ignore the definitional limits that inhere in the statute itself.

The use of the word "other" following the enumerated adjoining areas confirms that the scope and nature of the "other adjoining area[s]" are to be defined by reference to the enumerated areas; in other words, the additional unenumerated covered areas are to be understood as of the same type as those enumerated. Even if the statute had not used the word "other," we would, under the familiar canon of statutory interpretation *noscitur a sociis,* still look to the enumerated items in the series to determine which other "adjoining areas" would satisfy the situs requirement. *See Beecham v. United States,* — U.S. —, —, 114 S.Ct. 1669, 1671, 128 L.Ed.2d 383 (1994); *Dole v. United Steelworkers,* 494 U.S. 26, 36, 110 S.Ct. 929, 934, 108 L.Ed.2d 23 (1990).

Thus, an "other adjoining area" as to which coverage extends must be *like* a "pier," "wharf," "dry dock," "terminal," "building way," or "marine railway."[9] Each of these enumerated "areas" is a discrete structure or facility, the very *raison d'etre* of which is its use in connection with navigable waters. Therefore, in order for an area to constitute an "other area" under the statute, it must be a discrete shoreside structure or facility. And the asserted "area" must be "customarily used by an employer in loading, unloading, repairing, dismantling, or building a vessel," as the statute provides.[10] More-

---

632 F.2d at 514–15.

8. Sidwell argues that whether terminal expansion has forced relocation from a site directly adjoining navigable waters to one that does not adjoin such waters (but is the closest feasible), is relevant to whether a particular site adjoins navigable waters. We disagree. The exigency of even a forced relocation cannot transform a site distant from navigable waters into one that somehow "adjoins" those waters. The site either adjoins navigable waters or it does not, and, as the Supreme court has instructed, that is a geographical inquiry.

The same must be said with respect to the fact that ECS had mobile trucks which went to the terminal to perform minor repairs on-site. That an employer sends some workers to the waterfront—or even that an employer has a separate site altogether that is "adjoining" navigable waters—is not germane to the question of whether an injury occurred at a covered situs. The stat-

ute is expressly limited to the place where the "injury occurr[ed]"; an employer's other activities or locations are irrelevant to the geographic inquiry of whether the injury occurred at a covered situs.

9. The only term of these that is perhaps not within the common knowledge is "building way," which is a technical term that means "an inclined structure usually of timber upon which a ship is built or upon which a ship is supported in launching." WEBSTER'S THIRD NEW INT'L DICTIONARY 2587 (1993).

10. Both the court in *Sea–Land* and the Director rely upon this statutory language following "other adjoining area" to contend that the customary use of an area should be determinative of the situs inquiry. This language, however, is a *further* restriction upon "other adjoining areas"— implying that there are areas adjoining navigable

over, although one might be tempted initially to eschew any reliance on conventional property lines in defining "other adjoining area[s]," we believe that it is inescapable that some notion of property lines will be at least relevant, if not dispositive, in determining whether the injury occurred within a single "other adjoining area." [11] Indeed, it is for this reason that conglomerations of multiple properties, like the entire Commonwealth of Virginia, are not single "areas" under the terms of the statute.

This definition, unlike any of those fashioned by our sister circuits, gives full effect to the statute's language, yielding to the maximum extent possible the "clear geographical boundary" that the Court has explicitly recognized that Congress intended:

> [The] statute draws a clear geographical boundary that will predictably result in workers moving in and out of coverage.... [T]here will always be a boundary to coverage, and there will always be people who cross it during their employment.

*Herb's Welding*, 470 U.S. at 427, 426, 105 S.Ct. at 1429 (emphasis added).

At the same time, without extending coverage to "all those who breathe salt air," *id.* at 423, 105 S.Ct. at 1427, this interpretation achieves the "broad" remedial purposes for which the legislation was enacted, see *P.C. Pfeiffer Co.*, 444 U.S. at 74, 78, 100 S.Ct. at 332, 335. The LHWCA was enacted to address a specific problem, and the actual language that Congress chose does just that. The problem, as we have explained, was that longshoreman loading and unloading ships walked in and out of LHWCA coverage as they walked the gangplank from ship to shore. In response, Congress extended coverage to both navigable waters *and* "the adjoining land area," S. Rep. 92–1125, 92d Cong., 2d Sess. 13 (1972), so that the longshoremen at both ends of the gangplank would be covered equally by the LHWCA. As the Supreme Court has repeatedly stated, "Congress intended that a worker's eligibility for federal benefits would not depend upon whether he was injured while walking down a gangway or while taking his first step onto the land," *P.C. Pfeiffer*, 444 U.S. at 75, 100 S.Ct. at 333; rather, coverage would extend to "the waterfront areas where the overall loading and unloading process occurs." *Northeast Marine*, 432 U.S. at 272, 97 S.Ct. at 2361; *see also Herb's Welding*, 470 U.S. at 423, 105 S.Ct. at 1427 (explaining that Congress expanded coverage to include "rather large *shoreside* areas" (emphasis added)). The definition we adopt today ensures coverage for all maritime employees injured in the waterfront areas where the loading, unloading, and repair of vessels occurs, as Congress plainly intended and as the Supreme Court has directed.

In interpreting the act as we do, we realize that if Congress were confronted today with

---

waters that nonetheless do not meet the situs requirement because they are not customarily so used—not an implicit elimination of the requirement that the area first be adjoining navigable waters. In any event, reading the language in the manner proposed by the Director collapses the separate status and situs requirements into a single inquiry into status, in contravention of the Supreme Court's injunctions in *Herb's Welding*, 470 U.S. at 426, 105 S.Ct. at 1428, and *P.C. Pfeiffer Co.*, 444 U.S. at 79, 100 S.Ct. at 335, that we not read the status and situs requirements as one and the same.

11. In this regard, of course, it is the parcel of land that must adjoin navigable waters, not the particular square foot on that parcel upon which a claimant is injured. As the Fifth Circuit explained in *Alabama Dry Dock & Shipbuilding Co. v. Kininess*, 554 F.2d 176, 178 (5th Cir.), *cert. denied*, 434 U.S. 903, 98 S.Ct. 299, 54 L.Ed.2d 190 (1977) (distinguished in *Texports*):

> [The back lot upon which a crane was located by which claimant was injured was somewhere] from 150 to 2,000 feet from the water's edge. In any event the physical distance is not decisive here. The test is whether the situs is within a contiguous shipbuilding area which adjoins the water. Alabama Dry Dock's shipyard adjoins the water. The lot was part of the shipyard, and was not separated from the waters by facilities not used for shipbuilding.

And as the Director has concluded:

> [I]t is not unusual for marine terminals to cover many hundreds of acres. Such terminals are covered in their entirety; it is not necessary that the precise location of an injury be used for loading or unloading operations (whatever may be the proper scope of "loading or unloading") ...; it suffices that the overall area which includes the location is part of a terminal adjoining water.

LHWCA Program Memorandum No. 58 at 10–11 (1977) (footnote omitted).

further amendments to the statute, it conceivably might choose to cover areas in the "general proximity" or in the "neighborhood of" or "functionally related" to navigable waters. But we have no authority to concern ourselves with this possibility. There is no question at all that *in 1972* Congress was concerned only with areas immediately at waterside, where the loading and unloading of ships occurs, not with facilities separated and at some distance from the navigable waters. And here, no less so than in *Cowart,*

> [i]t is the duty of the courts to enforce the judgment of the Legislature, however much we might question its wisdom or fairness.... It is Congress that has the authority to change the statute, not the courts.

505 U.S. at 483–84, 112 S.Ct. at 2598.

■ With the understanding of the express language and the purpose of the statute described above, it is evident that ECS is not an "other adjoining area" within the meaning of the LHWCA.[12] While the ECS facility is arguably an "area" within the terms of the statute, it is not an area "adjoining" navigable waters. And, while the expanse of property between the navigable waters and ECS (together with structures and facilities that occupy that property) is, in some sense, "adjoining" navigable waters, it is not an "area" within the meaning of the statute. Accordingly, Sidwell was not injured on a covered situs under the LHWCA.

### III.

This is not a case in which ultimately the Director's interpretation of the statute is deserving of deference under *Chevron U.S.A. Inc. v. NRDC,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). The Director argues, in particular, that we should defer to OWCP's interpretation of the LHWCA as contained in "LHWCA Program Memorandum No. 58," an internal memorandum prepared in 1977 entitled "Guidelines for Determination of Coverage of Claims Under Amended Longshoremen's Act," which purports to "reflect OWCP's position" on the Act's coverage. This memorandum discusses situs in only slightly over a page of double-spaced text, none of which analyzes the statute, attempts to define a general rule or test for what constitutes an "other adjoining area," or otherwise purports to "interpret" the Act. *See id.* at 10–11. Essentially all it does is describe the factual circumstance of *Texports,* where the Act was held to apply, and state that coverage "should" extend to that circumstance. *Id.* at 11.

■ We are not certain that this brief passage from the 1977 internal memorandum even constitutes an actual agency interpretation of the LHWCA;[13] even if it were such an interpretation, it certainly would be entitled to less deference than a formal agency interpretation.[14] We are not certain in any

---

12. ECS also fails the *Brady–Hamilton* test and even a "totality of the circumstances" test. The ALJ expressly found that "there are no outstanding characteristics of the site that make it especially suitable for maritime use," the adjoining properties are not devoted primarily to maritime uses (indeed, many of them are residential), the terminal gates are %0 of a mile from the site, and the water is even farther. J.A. at 76. Therefore, even if we had declined to read the statute as it is written, and had instead adopted the *Brady–Hamilton* test or simply looked to the totality of the circumstances, we would still have affirmed the Board.

13. Our uncertainty is prompted both by the opacity of the language in the Memorandum and by the notable absence of language purporting to establish any interpretive rule. Additionally, the fact that the arguments made by the Director in her brief extend beyond any arguments that would be supported by the Memorandum suggests that the Memorandum alone does not clear-

ly support her position. Of course, no deference is owed her "interpretations" that are advanced only in the context of this litigation. *Bowen v. Georgetown University Hosp.,* 488 U.S. 204, 213, 109 S.Ct. 468, 474, 102 L.Ed.2d 493 (1988) ("Deference to what appears to be nothing more than an agency's convenient litigating position would be entirely inappropriate.").

14. As the Court explained in *Martin v. OSHRC,* 499 U.S. 144, 157, 111 S.Ct. 1171, 1179, 113 L.Ed.2d 117 (1991) (citations omitted) (emphasis added),

> [an agency] regularly employs less formal means of interpreting regulations prior to issuing a citation. These include the promulgation of interpretive rules and the publication of *agency enforcement guidelines.* Although *not entitled to the same deference as norms that derive from the exercise of the Secretary's delegated lawmaking powers,* these informal interpretations are *still entitled to some weight* on judicial review.

event that the 1977 Memorandum contradicts our interpretation of the statute; while the memorandum arguably embraces at least the outcome of *Texports*, it also notes, in describing the purposes of the Act, that "[the 1972 Amendments] exten[ded] ... the Act's geographical coverage to the *waterfront facilities* at which such workers are employed...." *Id.* at 5 (emphasis added). Assuming, however, that the 1977 Memorandum is a formal, official agency interpretation and assuming further that that interpretation is implicitly that adopted in *Texports*, that interpretation is not a reasonable interpretation of the statute. For *Texports*, as the Director acknowledges in the Memorandum, extends coverage to sites that concededly do not adjoin navigable waters, *id.* at 11, contrary to the plain language of [the Act. Indeed, the only limitation to coverage that the Director is willing to acknowledge in her briefs is that a location 1000 miles from navigable waters cannot be considered to adjoin those waters. *See* Br. for the Director, OWCP at 42. And in reality, the interpretation she urges would not recognize even this modest limitation. As her counsel conceded at argument, under the Director's interpretation even an injury in Kansas City, Kansas, would be covered under the Longshore and Harbor Workers Compensation Act as an injury occurring on an area adjoining navigable waters. If we, as courts, are required to yield to such an interpretation, then we have little to no role to play in the interpretation of federal statutes.

For the reasons stated, the judgment of the Board is affirmed.

*AFFIRMED.*

BEATY, District Judge, concurring:

I concur only in the results reached by the majority opinion in affirming the decision of the Administrative Law Judge (ALJ). The ALJ correctly applied the *Brady–Hamilton* test which was cited with approval in *Humphries*. This test provides a sufficient mechanism to resolve, on a case by case basis, situs issues raised by 33 U.S.C. § 903(a) as a part of the Longshore and Harbor Workers' Compensation Act (LHWCA). The facts of the present case do not justify abandoning

*Brady–Hamilton*, and creating a more restrictive interpretation of the situs test so as to preclude coverage for injuries sustained by maritime employees.

As indicated by footnote 12 of the majority opinion, the ALJ correctly applied the factors of *Brady–Hamilton* and "expressly found that 'there are no outstanding characteristics of the site that make it especially suitable for maritime use,' the adjoining properties are not devoted primarily to maritime uses (indeed, many of them are residential), the terminal gates are %0 of a mile from the site, and the water is even farther." The majority opinion further acknowledges that application of the *Brady–Hamilton* test was enough to deny coverage for failure to comply with the situs requirement.

With the expansion of terminal operations shrinking the available sites that actually touch navigable waters, as well as the development of technology that will increasingly push maritime work ashore, the *Brady–Hamilton* test provides an appropriate guidepost to determine whether the situs requirement has been met. Application of the test also makes it possible to draw a boundary line to coverage without being unnecessarily restrictive.

The majority, however, now favors creation of a more literal interpretation which will serve to exclude coverage, if the site in question does not actually touch navigable waters. This new test is crafted by defining "other adjoining area customarily used by an employer in loading, unloading, repairing, or building a vessel" as merely an extension of the enumerated sites which actually touch navigable waters. Such an interpretation would render the additional proviso superfluous. Congress by use of the phrase "or other adjoining area customarily used by an employer in loading, unloading, repairing, or building a vessel" provided a description of additional areas that would satisfy the situs test without requiring these additional sites to actually touch navigable waters. If Congress intended to further limit coverage, there would have been no need to describe additional covered sites beyond those already enumerated in the statute.

In appropriate circumstances, consistent with *Brady–Hamilton,* an injury to a maritime employee on an "other adjoining area customarily used by an employer in loading, unloading, repairing, or building a vessel" could be covered, even where the site did not actually touch navigable waters. However, based upon the facts of the present case, the ALJ's decision was a correct application of the *Brady–Hamilton* test which should not be abandoned by this Court. Simply put, the situs requirement was not met in this case, and covered should be denied to Sidwell. I concur in the results only to the extent that the decision of the Administrative Law Judge should be affirmed.