**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

JONATHAN CORPORATION,
Petitioner,

v.

MICHAEL C. BRICKHOUSE; DIRECTOR,

No. 96-2457

OFFICE OF WORKERS' COMPENSATION
PROGRAMS, UNITED STATES
DEPARTMENT OF LABOR,
Respondents.

JONATHAN CORPORATION,
Petitioner,

v.

MICHAEL C. BRICKHOUSE; DIRECTOR,

No. 97-1039

OFFICE OF WORKERS' COMPENSATION
PROGRAMS, UNITED STATES
DEPARTMENT OF LABOR,
Respondents.

On Petitions for Review of Orders
of the Benefits Review Board.
(95-1556)

Argued: October 30, 1997

Decided: April 23, 1998

Before RUSSELL,* NIEMEYER, and WILLIAMS, Circuit Judges.
_____

*Judge Russell heard oral argument in this case but died prior to the
time the decision was filed. The decision is filed by a quorum of the
panel. 28 U.S.C. § 46(d).

Petition for review granted and order of the Benefits Review Board reversed by published opinion. Judge Niemeyer wrote the opinion, in which Judge Williams joined.

_____

**COUNSEL**

**ARGUED:** F. Nash Bilisoly, IV, VANDEVENTER, BLACK, MEREDITH & MARTIN, L.L.P., Norfolk, Virginia, for Petitioner. John Harlow Klein, RUTTER & MONTAGNA, L.L.P., Norfolk, Virginia, for Respondents. **ON BRIEF:** Kelly O. Stokes, VANDEVENTER, BLACK, MEREDITH & MARTIN, L.L.P., Norfolk, Virginia, for Petitioner. Matthew H. Kraft, RUTTER & MONTAGNA, L.L.P., Norfolk, Virginia, for Respondents.

_____

**OPINION**

NIEMEYER, Circuit Judge:

We are presented with the jurisdictional question of whether the Longshore and Harbor Workers' Compensation Act ("LHWCA"), 33 U.S.C. § 901 et seq., covers an employee's injury sustained in a steel fabrication plant near navigable water. Coverage depends on satisfaction of a "situs" test and a "status" test. Because we conclude that the situs requirement is not met, we hold that the LHWCA does not cover the employee's injury and reverse the decision of the Benefits Review Board which ruled otherwise.

I

Michael C. Brickhouse was injured in August 1993, when a 12-foot square piece of steel fell on him while he was working for his employer, Tidewater Steel Company, a steel fabrication firm in Chesapeake, Virginia. Brickhouse was a welder who had worked for Tidewater Steel for four and one-half years. Following his injury he went to the hospital and has not returned to work.

The Tidewater Steel facility at which Brickhouse worked is an 80,000-square foot building which is divided into three bays. One bay

2

is used exclusively to fabricate steel for Jonathan Corporation, Tidewater Steel's parent corporation, for maritime related projects, such as the repair and replacement of ship components. The other two bays fabricate steel for bridges and other non-maritime projects.

Brickhouse had, over the years, spent substantial periods of time performing welding on components for installation in ships, and on occasion he would travel to the shipyards of Jonathan Corporation to work on the components' installation. The majority of his time, however, was expended in welding on non-maritime projects in the other two bays of the Tidewater Steel facility. Jonathan Corporation contends in its brief that the work records for Brickhouse, which are in the record, demonstrate that he worked more than 75% of the time on non-maritime projects. At the time of his injury, Brickhouse was working in a non-maritime bay of the plant on a railroad bridge that was to be shipped to Concord, North Carolina.

The property on which the Tidewater Steel facility is situated is contiguous to the Southern Branch of the Elizabeth River, a navigable waterway, and the property has a dock for loading barges. Tidewater Steel, however, receives all of its steel by rail or truck, and likewise ships out most of its fabricated product by rail or truck. From time to time, when components are especially large, it ships them by barge. The record reveals, for example, that on at least one occasion, the company shipped components of a flight deck by barge to a navy shipyard for installation on a navy ship.

In response to Brickhouse's claim for workers compensation under the LHWCA, Jonathan Corporation challenged coverage of the Act, contending that Brickhouse was not, at the time of his injury, on "navigable waters of the United States," as required by U.S.C. § 903(a), and that he was not engaged in "maritime employment," as required by 33 U.S.C. § 902(3). These requirements refer to "situs" and "status" requirements for jurisdiction, both of which must be satisfied. See Director, OWCP v. Perini N. River Assocs., 459 U.S. 297, 314 (1983); Northeast Marine Terminal Co. v. Caputo , 432 U.S. 249, 265, 279 (1977); Pittman Mech. Contractors v. Director, OWCP, 35 F.3d 122, 125 (4th Cir. 1994).

The ALJ found that both situs and status requirements were satisfied in this case. In finding the situs requirement met, he observed that

3

the plant was located on a navigable waterway which was used on occasion to ship heavy prefabricated steel, such as flight decks, for installation on ships. While the ALJ assumed that the majority of the plant's work was committed to the fabrication of non-maritime steel products shipped by rail or truck, he observed that a "significant amount of its work is maritime related." The ALJ concluded:

> [T]he evidence of record establishes Claimant's injury took place in an adjoining area to a navigable waterway, the South Branch of the Elizabeth River. The adjoining area is the Tidewater Steel facility in Chesapeake, Virginia. That location is used by the employer in loading and unloading vessels. Consequently, Claimant has established the situs requirement.

In finding the status requirement met, the ALJ held that a claimant "need not be engaged in maritime employment at the time of the relevant injury" and that a claimant "who regularly performs duties relating to maritime employment should not be denied coverage if injured while temporarily performing some non-maritime activity." He concluded that a "significant amount" of Brickhouse's work was maritime in nature because he welded on components intended for installation in ships, because he sometimes installed components on ships, and because he sometimes worked at amphibious bases and at shipyards. The ALJ thus concluded that, even though the claimant was working on non-maritime work at the time of his injury, "he is one of those employees who can walk in and out of maritime activity at the whim of his employer."

Having found both the situs and status requirements satisfied, the ALJ concluded that Brickhouse was an employee covered by the LHWCA. The Benefits Review Board affirmed, and this appeal followed.

II

Until 1972, the Longshoremen's and Harbor Workers' Compensation Act ("Longshoremen's" remained in the Act's title until 1984 when it was changed to "Longshore") provided coverage for injuries occurring only "upon the navigable waters of the United States

4

(including any dry dock)." 33 U.S.C. § 903 (1970 ed.). If an injury occurred on a pier adjoining navigable waters, it occurred on the land side of jurisdiction, and coverage of the Act was denied. See Nacirema Operating Co. v. Johnson, 396 U.S. 212, 223-24 (1969). The "line of demarcation" between land and water defined the line between coverage of the Longshoremen's and Harbor Workers' Compensation Act and coverage of state workers' compensation laws. Director, OWCP v. Perini N. River Assocs., 459 U.S. 297, 316 (1983). "As a consequence, longshoremen continually walked in and out of LHWCA coverage as they walked up and down the gangplank from ship to shore during the loading and unloading of vessels." Sidwell v. Express Container Servs., Inc., 71 F.3d 1134, 1135 (4th Cir. 1995) (citing S. Rep. 92-1125, 92nd Cong., 2d Sess. 12-13 (1972)). In Nacirema, the Supreme Court stated that any invitation "to move that line [of jurisdiction] landward must be addressed to Congress, not to this Court." Id. at 224. As the Court later observed, "In 1972, Congress moved the line." Caputo, 432 U.S. at 260.

The 1972 amendments to the Longshoremen's and Harbor Workers' Compensation Act moved the line landward by including in the definition of navigable waters "any adjoining pier, wharf, dry dock, terminal, building way, marine railway, or other adjoining area customarily used by an employer in loading, unloading, repairing, dismantling, or building a vessel." 33 U.S.C. § 903(a). In so moving the line, however, Congress recognized that non-maritime employees would be included within coverage under a pure situs test. Consequently, it also limited the class of employees covered by defining employee to mean "any person engaged in maritime employment, including any longshoreman or other person engaged in longshoring operations, and any harbor-worker including a ship repairman, shipbuilder, and ship-breaker." 33 U.S.C. § 902(3).

One of Congress' principal purposes in moving the coverage line landward was to provide more uniform coverage for longshoremen as they loaded and unloaded ships and repaired them. See Herb's Welding, Inc. v. Gray, 470 U.S. 414, 426 (1985); Caputo, 432 U.S. at 272. It made little sense that a longshoreman injured at one end of a gangplank was covered, while at the other end, he was not covered, even though he was doing the same job. Also, with the advent of containerization and other modern loading techniques, much of the loading and

5

unloading work was done on the pier adjacent to the ship. See Caputo, 432 U.S. at 269-70. Thus, Congress believed that coverage for a person who did traditional longshoremen's work both on the water and on the adjacent land should not depend on where the person was standing in relation to the water's edge when injured. See id. at 272.

With the 1972 amendments, the test for coverage thus changed from a simple situs test to a test incorporating situs and status requirements. Even with the new situs boundary moved landward, however, the situs requirements still establish a geographical boundary for coverage. See Herb's Welding, 470 U.S. at 427; Caputo, 432 U.S. at 263-64. As with any geographical boundary, workers can still move across that boundary into and out of the Act's coverage. See Herb's Welding, 470 U.S. at 426 ("[T]here will always be a boundary to coverage, and there will always be people who cross it during their employment."); Humphries v. Director, OWCP, 834 F.2d 372, 373-74 (4th Cir. 1987). The question now, however, is where the geographical boundary for coverage of the LHWCA runs and, more particularly, whether it includes the location where Brickhouse was injured.

Jonathan Corporation contends that the boundary does not encompass the situs where Brickhouse was injured. It notes that he was injured while fabricating steel for an inland bridge in a steel fabrication plant located "approximately 1,000 feet from the Elizabeth River." It argues that Brickhouse's work area is not "contiguous with a navigable waterway" and that the facility in which he was working was not "like a pier, wharf, dry dock, terminal, building way, or marine railway. . . . Tidewater Steel is a plant where heavy steel is fabricated." It argues further that the Tidewater Steel plant was not customarily used for loading, unloading, repairing, dismantling, or building a vessel. It notes that Tidewater Steel did not even have a shoreside crane that could be used for those purposes at the water's edge of its property.

Brickhouse, arguing for coverage, states that the Tidewater Steel facility is contiguous to navigable waters because the plant's property extends to the water's edge. He argues, moreover, that Tidewater Steel has in fact loaded fabricated steel onto barges from its property. Finally, he notes that one entire bay of the Tidewater Steel facility is dedicated to the fabrication of ship-bound components.

6

Because the facts relating to the resolution of the situs issue are not substantially in dispute, coverage becomes a question of law which we determine de novo. The Board's adjudicatory interpretations of the LHWCA are thus not entitled to deference but rather are subject to our independent review. See Potomac Elec. Power Co. v. Director, OWCP, 449 U.S. 269, 278 n.18 (1980); Pittman Mech. Contractors v. Director, OWCP, 35 F.3d 122, 125 (4th Cir. 1994).

The situs requirement of the LHWCA limits coverage only to injuries

> occurring upon the navigable waters of the United States (including any adjoining pier, wharf, dry dock, terminal, building way, marine railway, or other adjoining area customarily used by an employer in loading, unloading, repairing, dismantling or building a vessel).

33 U.S.C. § 903(a). In extending the line of coverage landward, Congress thus defined navigable waters to include certain land areas "adjoining" the navigable waters.

The landward extension is a seamless annexation of land to navigable waters for purposes of LHWCA coverage. See Caputo, 432 U.S. at 263. But the annexation does not include all adjacent land. The statute extends "navigable waters" only to land relating to work on those waters, specifically enumerating adjoining piers, wharfs, dry docks, terminals, building ways, and marine railways. See 33 U.S.C. § 903(a). These are facilities customarily used by longshoremen in loading and unloading ships and in repairing or building them. See Caputo, 432 U.S. at 271 n.32. The link between the navigable waters and the land side facilities is thus established under the statute by (1) the contiguity of the land side facility and navigable water, and (2) the affinity of the land side facility to longshoremen's work on ships.

Anticipating that its enumeration of land side facilities might not be complete, Congress also incorporated a catchall term in § 903(a) to include any "other adjoining area customarily used by an employer in loading, unloading, repairing, dismantling, or building a vessel." 33 U.S.C. § 903(a). But again, Congress did not abandon its legislating principle of connecting this "other area" to the work of longshoremen

7

on navigable waters. The "other area" annexed to navigable waters by the Act must again be "adjoining" the water and must again be linked to the traditional longshoremen's work on the water. The "other area" must be for the loading or unloading of cargo onto ships in navigable waters or for the "repairing, dismantling, or building" of those ships. Id.

In the foregoing manner, Congress was careful to address the problem of a longshoreman walking into and out of jurisdiction at water's edge as he performed traditional longshore work on and off ships in navigable waters. It did so by drawing a new line of demarcation landward. See, e.g., Caputo, 432 U.S. at 266 n.27 (quoting legislative reports).

These principles are mostly established in our circuit. In Sidwell, we noted that land is made part of navigable waters for purposes of LHWCA coverage "only if it `adjoins' navigable waters, that is, if it is `contiguous with' or otherwise `touches' such waters." 71 F.3d at 1138-39. While the problem presented in Sidwell did not require us to address the nature of land side facilities that the LHWCA covers, we did observe the controlling principle that the kinds of property that the LHWCA enumerates are "discrete structure[s] or facilit[ies], the very raison d'etre of which is [their] use in connection with navigable waters." Id. at 1139; see generally Humphries, 834 F.2d at 375 ("[T]he LHWCA requires us to draw a spacial line for coverage under the Act").

The situs test, in sum, is a geographical one, and even though a longshoreman may be performing maritime work, if he is not injured within the land area specified by the statute, he is not covered by the Act.

Consistent with these principles, we have held that when a longshoreman moved out of coverage, even momentarily, leaving a shoreside facility in a car to pick up food for his fellow workers, he was not covered by the LHWCA when he was injured during that momentary departure. See Humphries, 834 F.2d at 375. When Congress addressed a longshoreman's moving into and out of coverage at water's edge as he unloaded a ship or repaired it, Congress did not purport to eliminate the phenomenon of moving into and out of cover-

8

age -- such a condition necessarily attends any geographical boundary of coverage. See Herb's Welding, 470 U.S. at 426-27 (noting that there always will be a boundary of coverage which people cross during their employment). Rather, it moved the line landward only to lessen the irrationality of a line at water's edge where coverage depended on which end of the gangplank a longshoreman was injured. See id.; Caputo, 432 U.S. at 272.

With these principles in hand, we may readily apply them to the case before us. At the time of his employment, Brickhouse was fabricating steel parts for an inland bridge in North Carolina. He was fabricating them in a steel fabrication plant which was not a pier, wharf, dry dock, terminal, building way, or marine railway. Nor was it, we conclude, a similar type of facility that fits the catchall provision. While at the plant, the employees' work did not routinely take them from within the plant, onto adjoining water, and back again into the plant. On the contrary, when at the plant, their work kept them in the plant to fabricate steel components that were shipped from the plant, usually by rail or truck, either to an inland site or to a ship on navigable waters for installation. The very fact that it was necessary for the components to be shipped from the plant before their installation, whether by ship or not, provides the fact that insulates the plant from navigable waters and distinguishes Brickhouse's work location from that of the traditional longshoreman's workplace at the water's edge. When Brickhouse worked on ships, which he occasionally did, he traveled by land to the shipyards where he then installed fabricated parts. During these times, he was undoubtedly on a situs covered by the LHWCA. But while at the Tidewater Steel plant, his situs was no different than it would have been at any steel fabrication plant anywhere in the land.

Brickhouse argues that the fact that the Elizabeth River runs contiguous to the plant's property satisfies the situs requirement. That fact, however, is simply fortuitous. The plant was not connected to the Elizabeth River in any way necessary to make workers in the plant longshoremen working at the water's edge. Indeed, the plant was almost a thousand feet from the water's edge, and it was not "customary" for the plant's workers to move between land and water in any regular way. They remained in the plant fabricating maritime and

9

non-maritime components, just as they would have done if the plant were located at any inland site.

Stated otherwise, the steel fabrication plant where Brickhouse was injured was not a facility, the "raison d'etre of which is its use in connection" with the nearby navigable waters. See Sidwell, 71 F.3d at 1139. The plant did not serve ships at the water's edge. Indeed, there is no evidence that Tidewater Steel ever repaired, dismantled, or built a ship at its barge dock on the Elizabeth River. Rather, it served ships at other locations by manufacturing components at its plant and shipping them from the plant to the other locations. Moreover, the fact that components were, on rare occasions, shipped by barge from Tidewater Steel's dock is not meaningful. The barge dock on Tidewater Steel's property would be relevant only if barges were the "customary" method of shipment and if its employees were longshoremen who customarily loaded the barge at the facility. See 33 U.S.C. § 903(a). But the evidence in the record is insufficient to draw either conclusion.

Because we conclude that at the time of his injury, Brickhouse was not on a situs covered by the LHWCA, we need not address the more complex question of whether Brickhouse was injured while engaging in maritime employment. See, e.g., Herb's Welding, 470 U.S. at 424-25 (observing, "we have never read `maritime employment' to extend so far beyond those actually involved in moving cargo between ship and land transportation" to include a claimant who was a welder, and thus a welder, without more, "was not engaged in maritime employment"). The petition for review is granted, and the judgment of the Benefits Review Board is

REVERSED.

10