# UNITED STATES COURT OF APPEALS

## FOR THE FOURTH CIRCUIT

STEVEN WALKER,

*Petitioner,*

v.

METRO MACHINE CORPORATION;
OFFICE OF WORKERS' COMPENSATION
PROGRAMS,

*Respondents.*

No. 02-1059

On petition for review of an order of the
Benefits Review Board.
(01-368)

Argued: September 26, 2002

Decided: October 29, 2002

Before NIEMEYER, LUTTIG, and MICHAEL Circuit Judges.

Affirmed by unpublished per curiam opinion.

## COUNSEL

**ARGUED:** Robert Elliott Walsh, RUTTER, WALSH, MILLS &
RUTTER, Norfolk, Virginia for Appellant. F. Nash Bilisoly IV,
VANDEVENTER BLACK, L.L.P., Norfolk, Virginia for Appellee.

Unpublished opinions are not binding precedent in this circuit. See
Local Rule 36(c).

**OPINION**

PER CURIAM:

Steven Walker, a shipfitter, was injured at the Mid-Atlantic facility of Metro Machine Corporation ("Metro Machine"). He sought compensation under the Longshore and Harbor Workers' Compensation Act ("LHWCA"), 33 U.S.C. § 901 *et seq*. The ALJ denied Walker benefits, finding that the injury did not occur on a situs covered by the LHWCA, and the Department of Labor Benefits Review Board affirmed. Because the facts of this case are virtually indistinguishable from those in *Jonathan Corporation* v. *Brickhouse*, 142 F.3d 217 (4th Cir. 1998), we affirm.

I.

Walker was injured in October 1998, while working for his employer, Metro Machine, a ship repair company in Norfolk, Virginia. Walker was employed as a shipfitter. His job required him to engage in hull and structural work on ships and to construct steel parts for ships.

Metro Machine has two facilities adjacent to navigable waters: the Mid-Atlantic facility and the Imperial Docks facility. J.A. at 96. While Walker occasionally worked at Imperial Docks, he primarily worked at Mid-Atlantic, J.A. at 98, and he sustained the injury at issue while working at Mid-Atlantic. The Mid-Atlantic facility abuts the Elizabeth River and is used for fabricating components for and repairing pieces of Navy and other ships that are under repair at Imperial Docks, where there are wet and dry docks. Metro Machine removes parts from the ships at Imperial Docks and ships them, via truck or barge, to Mid-Atlantic. J.A. at 96. Somewhere between 5 and 20 percent of the material is sent by barge. The Mid-Atlantic facility has a bulkhead on the river where the barge ties up, but no pier or dry dock. J.A. at 97.

The Mid-Atlantic facility has two main areas, one which is adjacent to the Elizabeth River — the "back parcel" — and one which is not — the "front parcel." These areas are separated by a fenced-off

jogging path and the City of Norfolk owns the easement. There is a gravel road across the jogging path that permits access, via gates, to both areas during working hours for employees. *Id*. Walker was injured on the front parcel of land, just outside the fabrication shop.

Walker sought benefits under the LHWCA. The ALJ denied his claim because he found situs jurisdiction lacking on two independent grounds. First, he found that the injury did not occur on an adjoining area under this court's decision in *Sidwell* v. *Express Container Services, Incorporated*, 71 F.3d 1134 (4th Cir. 1995). Second, he found that the Mid-Atlantic facility was not a covered situs under this court's decision in *Brickhouse*. The Benefits Review Board did not express opinion on the first ground but affirmed on the second. Walker petitioned this court for review of the Board's decision.

## II.

Whether situs jurisdiction is present in this case is a question of law, which we review *de novo*. *See Brickhouse*, 142 F.3d at 221 (stating that courts independently review the Board's adjudicatory interpretations of the LHWCA). The presence of situs jurisdiction under the LHWCA is governed by section 903(a), which limits coverage to injuries:

> occurring upon the navigable waters of the United States (including any adjoining pier, wharf, dry dock, terminal, building way, marine railway, or *other adjoining area customarily used by an employer in loading, unloading, repairing, dismantling, or building a vessel*).

33 U.S.C. § 903(a) (emphasis added).

In *Brickhouse*, we applied section 903(a) to facts that were strikingly similar to those in the instant case. The facility in *Brickhouse* fabricated steel parts for maritime related purposes, such as repair and replacement of ship components. *See Brickhouse*, 142 F.3d at 218. It was contiguous with a navigable waterway and the property had a dock for loading barges. *Id*. at 219. The facility "served ships at other locations by manufacturing components at its plant and shipping them

from the plant to the other locations." *Id*. at 222. Most of the supplies reached the facility by truck and most of its product left by the same. Sometimes, however, especially large components would be shipped by barge. *Id*. at 219.

We concluded that situs jurisdiction was not present under those facts. In order to be covered under the catch-all provision of section 903(a), we reasoned, the purpose of the facility must be its use in connection with the "nearby navigable waters." *Id*. at 222. The fact that the *Brickhouse* facility was contiguous with a navigable waterway was "simply fortuitous." *Id*. The facility did not serve ships at the water's edge, and it could not be said that its *raison d'etre* was its use in connection with the navigable waters contiguous to it. "The very fact that it was necessary for the components to be shipped from the plant before their installation, whether by ship or not, provides the fact that insulates the plant from navigable waters and distinguishes Brickhouse's work location from that of the traditional longshoreman's workplace at the water's edge." *Id*. Finally, we dismissed the fact that components were, "on rare occasions," shipped by barge from the facility. *Id*. This fact would be relevant "only if barges were the 'customary' method of shipment and if its employees were longshoremen who customarily loaded the barge at the facility." *Id*.

The facts of the instant case are not materially distinguishable from those of *Brickhouse*. The Mid-Atlantic facility is also devoted to fabricating and repairing parts that then must be shipped to Imperial Docks, where they are installed. As in *Brickhouse*, all that can be said of the Mid-Atlantic facility is that it "serve[s] ships at other locations." *Id*. While at the Mid-Atlantic facility, the employees' work does not "routinely take them from within the plant, onto adjoining water, and back again into the plant." *Id*. As the ALJ found, "[e]xcept for the bulkhead, the Mid-Atlantic facility could be duplicated in any location." J.A. at 97. And given that only 5 to 20 percent of shipments to and from the Mid-Atlantic facility were by barge, it cannot be said that "barges were the 'customary' method of shipment."[1] *Brickhouse*,

---

[1]"Customarily" means "according to custom; usually." *Webster's New World Dictionary* 349 (2d ed. 1984). "Usual" is defined as "such as is in common or ordinary use; such as is most often seen, heard, used, etc.; common; ordinary; customary." *Id*. at 1564.

142 F.3d at 222. Because the instant case is not distinguishable from *Brickhouse* in any material way, we are bound by *Brickhouse* and conclude that situs jurisdiction is absent.

In an attempt to distinguish *Brickhouse*, Walker points to various factual differences, only a few of which merit comment. Walker first argues that this case is distinguishable because the Mid-Atlantic facility is entirely devoted to ship repair, whereas only one third of the facility in *Brickhouse* was so devoted. *See id.* at 218-19. But nowhere did the *Brickhouse* court say that the portion of the facility devoted to ship work was dispositive, or even relevant for that matter. Rather, the critical factor was the relationship of the facility to the nearby navigable waters. Here, as in *Brickhouse*, the relationship is simply fortuitous. Walker argues that the relationship was necessary because certain parts were so large that they could only be shipped by barge. This argument fails because, however important, barges simply were not the customary method of shipment.

Second, Walker argues that in *Brickhouse* there was no evidence that the facility ever repaired, dismantled, or built a ship at its dock. *See id.* Here, however, a mite tug boat did undergo repair at the Mid-Atlantic facility. *See* J.A. at 98. The presence of one small tug boat is not enough to change the outcome however. The mite tug was not docked and repaired until after Walker's injury, and, in any case, one instance of on-site repair after years of operation does not constitute the "customary" use of the facility.

Finally, Walker argues that he actually loaded and unloaded barges at the water's edge. This fact again would only be significant if the Mid-Atlantic employees "were longshoremen who customarily loaded the barge at the facility." *Brickhouse*, 142 F.3d at 222. The ALJ found, however, that about 75 percent of Walker's work was completed inside the fabrication shop, J.A. at 98, and the record does not indicate that the other employees at Mid-Atlantic engaged in more frequent loading and unloading activity. Thus, it is clear that Walker's customary employment was in the fabrication shop and his occasional ventures to the water's edge were the exception rather than the rule. That exception is insufficient to confer situs jurisdiction.[2]

---

[2] Because we find situs jurisdiction lacking under *Brickhouse*, we need not consider Metro Machine's argument that jurisdiction is also absent under *Sidwell*.

The judgment of the Benefits Review Board is affirmed.

*AFFIRMED*