CARL E. STEWART, Chief Judge,
dissenting, joined by DENNIS and GRAVES, Circuit Judges:
Over thirty years ago, our en banc court confronted the same issue we confront to *400 day: how to interpret the geographic component of the situs test in the Longshore and Harbor Workers’ Compensation Act (“LHWCA” or “the Act”) and specifically, how to define “adjoining area” under the Act.[1] Texports Stevedore Co. v. Winchester, 632 F.2d 504 (5th Cir.1980) (en bane), cert denied, 452 U.S. 905, 101 S.Ct. 3031, 69 L.Ed.2d 406 (1981). The Winchester majority adopted a broad definition of “adjoining area” that was in keeping with the plain meaning of the words, as well as “the spirit of the congressional purposes.” Id. at 514. The decades since Winchester was decided have revealed no catastrophic consequences of that decision. Nonetheless, the majority now overrules this precedent and adopts the Fourth Circuit’s more restrictive definition of “adjoining area,” thereby enhancing an existing circuit split. As I find no compelling reason to alter the LHWCA legal landscape in this circuit, I respectfully dissent.
I.
To support its adoption of the Fourth Circuit’s test, Sidwell v. Express Container Servs., Inc., 71 F.3d 1134 (4th Cir.1995), the majority advances two arguments critical of Winchester: (1) the court provided only vague instructions as to how to analyze the totality of the circumstances; and (2) that the court’s interpretation of “adjoining area” is not faithful to the plain language of the LHWCA. I address each argument in turn.
A.
The majority criticizes Winchester for dispensing “vague instructions [that] provided little guidance to other courts or future litigants on how to determine from ‘the circumstances’ whether a claimant satisfies the situs test.” Op. at 390. However, in the thirty-three years since it was passed, Winchester has not proven to be overly vague or unworkable. Indeed, the standard is clear enough that since 1980, there have been only nine cases in this circuit where the meaning of “adjoining area” was contested. Moreover, few of these cases challenged the application of Winchester to land-based operations. Coastal Prod. Servs., Inc. v. Hudson, 555 F.3d 426 (5th Cir.2009) (deciding that fixed loading platform was a maritime situs); Thibodeaux v. Grasso Prod. Mgmt. Inc., 370 F.3d 486 (5th Cir.2004) (holding that a fixed oil production platform was not a covered situs); Boomtown Belle Casino v. Bazor, 313 F.3d 300 (5th Cir.2002) (holding that floating casino was not a covered situs); E.J. Fields Mach. Works Inc. v. Guidry, 54 Fed.Appx. 793 (5th Cir.2002) (per curiam) (unpublished) (affirming LHWCA situs status for job shop specializing in the repair and construction of marine parts where shop was one-hundred feet from river and located in area customarily used for maritime activity); Mobil Mining & Minerals v. Nixson, 209 F.3d 719 (5th Cir.2000) (per curiam) (unpublished) (holding injury at premises adjacent to the Houston Ship Channel occurred on a covered situs); Sisson v. Davis & Sons, Inc., 131 F.3d 555 (5th Cir.1998) (per curiam) (holding that injury in a parking lot did not occur on a covered situs); Universal Fabricators, Inc. v. Smith, 878 F.2d 843 (5th Cir.1989) (upholding ALJ’s situs determination where employer’s yard adjoined *401 navigable waters); Reynolds v. Ingalls Shipbldg. Div., Litton Sys., Inc., 788 F.2d 264 (5th Cir.1986) (discussing coverage for seaman injured at sea); Alford v. Am. Bridge Div., U.S. Steel Corp., 642 F.2d 807 (5th Cir.1981), modified in part, 668 F.2d 791 (5th Cir.1981) (holding employer’s location on the Sabine River fell within the situs requirement). Additionally, Petitioners have presented no industry reports, data, hearings, or related information to support any alleged negative effects Winchester has had on the maritime industry.
In the absence of any compelling evidence of Winchester’s dysfunction or change in the maritime industry, I decline to join the majority in overruling well-reasoned precedent of this en banc court that involves carefully-considered statutory interpretation. “[<8 ]tare decisis in respect to statutory interpretation has ‘special force,’ for ‘Congress remains free to alter what we have done.’ ” John R. Sand & Gravel Co. v. United States, 552 U.S. 130, 139, 128 S.Ct. 750, 169 L.Ed.2d 591 (2008) (quoting Patterson v. McLean Credit Union, 491 U.S. 164, 172-73, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989)).
B.
The majority also reasons that the Fourth Circuit’s interpretation of “adjoining area” is more faithful to the plain language of the statute. The Winchester Court observed that “adjoin” could be defined as “contiguous to or to border upon,” as well as “to be close to or to be near.” 632 F.2d at 514 (citation and internal quotation marks omitted). The Winchester court chose to adopt the second set of definitions in accordance with its interpretation of congressional intent. Id. In repudiating this interpretation, the majority here cites with approval Sidwell’s comment that while “dictionaries do include ‘neighboring’ and ‘in the vicinity of as possible definitions of ‘adjoining,’ ... such is not the ordinary meaning of the word.” 71 F.3d 1134, 1138.
Webster’s Third New International Dictionary defines “adjoining” as “touching or bounding at some point or on some line: near in space.” Webster’s Third New Int’l Dictionary 27 (1993). Other dictionaries define adjoining similarly — that is, with more than one definition, one of which does not require contiguity. See, e.g., Am. Heritage Dictionary of the English Language 22 (1992) (“neighboring; contiguous”); but see Black’s Law Dictionary 62 (1968) (“The word in its etymological sense means touching or contiguous, as distinguished from lying near to or adjacent.”). The majority refuses to construe “adjoin-, ing area” liberally because “the first rule of statutory construction is that we may not ignore the plain language of the statute.” However, this argument does not recognize the multiple ordinary meanings of “adjoining” nor the ambiguity intrinsic in defining how far from shore an “adjacent area” extends. Such ambiguities as these may be resolved by applying canons of statutory interpretation, including an analysis of legislative history. See Perrone v. Gen. Motors Acceptance Corp., 232 F.3d 433, 440 (5th Cir.2000).
Accordingly, the Winchester court reasonably- — and properly, in my opinion— sought to resolve the issue by looking to congressional intent and Supreme Court precedent. See, e.g., Winchester, 632 F.2d at 514-15; see also Ne. Marine Terminal Co. v. Caputo, 432 U.S. 249, 261-65, 97 S.Ct. 2348, 53 L.Ed.2d 320 (1977) (describing expansion of LHWCA coverage under 1972 amendments). The Winchester court’s broad reading of the complete clause, “adjoining area,” also was consistent with “[o]ne of the primary motivations for Congress’ decision to extend [LHWCA] coverage shoreward,” which was the “rec *402 ognition that the advent of modern cargo-handling techniques had moved much of the longshoreman’s work off the vessel and onto land.” Caputo, 432 U.S. at 269-70, 97 S.Ct. 2348. Attendant to this recognition is the practical reality that the amount of land contiguous to the water is limited. Consider the following scenario: A company maintains three gear rooms, all of which are supervised by the same shop foreman. Two of those gear rooms are on the docks, but the third is located a few blocks away from the docks because there was insufficient space for an additional gear room on the docks, and the company could find no space closer to the docks.[2] Under the majority’s strict interpretation of the Act, a worker injured in the gear room on the docks will be covered under the LHWCA, but an identical worker injured under the same circumstances at the off-dock location will not be covered. While I acknowledge that “there will always be a boundary to coverage,” Herb’s Welding, Inc. v. Gray, 470 U.S. 414, 426-27, 105 S.Ct. 1421, 84 L.Ed.2d 406 (1985), I am not convinced Congress intended this type of “harsh and incongruous” result. Capwto, 432 U.S. at 268, 97 S.Ct. 2348 (citation and internal quotation marks omitted).
Moreover, as Petitioner conceded at oral argument, adopting a narrow definition of “adjoining area” would allow maritime employers to circumvent LHWCA coverage by purchasing land with a narrow gap separating it from the water. See, e.g., Walker v. Metro Mach. Corp., 50 Fed.Appx. 104 (4th Cir.2002) (per curiam) (unpublished) (declining to disturb ALJ’s decision finding facility was not a covered situs because employer’s waterfront facility was divided into two areas separated by a fenced-off path owned by the city, and employee was injured in area not contiguous to navigable waters).
II.
Although the majority discusses the circuit split that exists between the Fourth and Ninth Circuits[3], it fails to observe the extent to which the Fourth Circuit’s test is an outlier among circuits that have addressed this issue. No other circuit has adopted Sidwell’s restrictive test. Instead, the trend is to adopt a more expansive view of coverage. See Consolidation Coal Co. v. Benefits Review Bd., 629 F.3d 322, 330-31 (3d Cir.2010) (adopting a liberal reading of “adjoining area” after looking to Winchester and the Ninth Circuit, and specifically rejecting the Sidwell approach); Cunningham v. Dir., Office of Workers’ Comp. Programs, 377 F.3d 98, 105 (1st Cir.2004) (assuming without deciding that ALJ and Benefits Review Board were correct to apply Ninth Circuit’s approach); Garvey Grain Co. v. Dir., Office of Workers’ Comp. Programs, 639 F.2d 366, 369-71 (7th Cir.1981) (applying a “liberal” test following Caputo). Additionally, the majority’s decision creates a split with the Eleventh Circuit, which continues to apply Winchester. See, e.g., Ramos v. Dir., OWCP, 486 Fed.Appx. 775 (11th Cir. 2012) (per curiam) (unpublished). Given *403 the importance of maintaining uniformity in maritime law, I disagree with the majority’s decision to move away from the more liberal interpretation favored by the majority of circuits that have addressed the issue.
III.
As I also disagree with Judge Clement’s concurrence, I briefly address the key difficulties with her separate opinion.
In addition to the situs requirement already discussed, an injured claimant must also satisfy the status requirement. See 33 U.S.C. § 902(3) (“The term ‘employee’ means any person engaged in maritime employment, including any longshoreman or other person engaged in longshoring operations, and any harbor-worker including a ship repairman, shipbuilder, and ship-breaker_”). The Act does not define “maritime employment,” but the Supreme Court has explained that “employees who are injured while maintaining or repairing equipment essential to the loading or unloading process are covered by the Act_Someone who repairs or maintains a piece of loading equipment is just as vital to and an integral part of the loading process as the operator of the equipment.” Chesapeake & Ohio Ry. Co. v. Schwalb, 493 U.S. 40, 47, 110 S.Ct. 381, 107 L.Ed.2d 278 (1989).
The concurrence argues that “container repair is not customarily the task of longshoremen .... ” Concurrence Op. at 397. Respectfully, I disagree. While this statement may have been true many years ago, it does not acknowledge the changes in the maritime industry in the twentieth century that were reflected in the 1972 amendments to the LHWCA and subsequent Supreme Court precedent. As the Supreme Court recognized thirty-five years ago, “the container is the modern substitute for the hold of the vessel.” Caputo, 432 U.S. at 270, 97 S.Ct. 2348. Moreover, I find it persuasive that the Benefits Review Board decided over thirty years ago that container repair mechanics are engaged in maritime employment. See, e.g., Cabezas, 11 Ben. Rev. Bd. Serv. (MB) 279 (1979), Parker, 8 Ben. Rev. Bd. Serv. (MB) 321 (1978).
The concurrence then distinguishes between two types of container repair: (1) repair that is “one step in the direct chain of unloading a ship and when ‘the maintenance men would [halt] the entire loading process’ if they were not available for the repair” and (2) repair “not of the sort that is, or would have been, traditionally performed by longshoremen or harborwork-ers.” Concurrence Op. at 397. I find this distinction problematic. The concurrence does not lay out a clear test for this distinction but relies on four characteristics of Zepeda’s work to find that he falls into the second category — the containers Zepeda repaired were (1) empty, (2) not headed for delivery, (3) not headed toward a ship for transport, and (4) “may well have been destined for a truck or train rather than a vessel.” Concurrence Op. at 397. The concurrence has cited no authority, nor am I aware of -any such authority, that would support the adoption of tests requiring a quantitative assessment of a container’s contents or a requirement that each individual container an employee works on be tracked from its origin to its ultimate destination. Furthermore, the concurrence’s assertions contradict the ALJ’s findings, which are “conclusive if supported by substantial evidence in the record considered as a whole.” 33 U.S.C. § 921(b)(3). The ALJ found, based on the weight of the evidence, that Zepeda worked on Evergreen marine containers while he was a NODSI employee. There is substantial evidence in the record to support this conclusion, including testimony that (1) some of the Evergreen containers repaired by *404 NODSI were used for marine transportation; (2) some of the containers were offloaded at the Port of New Orleans; (3) it was common for empty containers to be loaded onto and unloaded from ships; (4) NODSI initially only serviced Evergreen containers and was required under Evergreen’s labor contract to hire unionized maritime workers who were the only workers permitted to work on marine containers; and (5) when Zepeda began working for NODSI, he was a unionized maritime worker. Repair of marine containers lies within the scope of maritime employment, and the proper functioning of these containers, including maintenance and repair when damage is discovered, is essential to the loading and unloading process. “It is irrelevant that an employee’s contribution to the loading process is not continuous or that repair or maintenance is not always needed.” Schwalb, 493 U.S. at 47,110 S.Ct. 381.
Finally, the concurrence appears to disregard the need for companies to engage in maintenance and repair before the container condition becomes so degraded as to render it unusable and a physical impediment to the loading or unloading process. The Supreme Court recognized the necessity of continuously maintaining equipment with the goal toward preventing machinery breakage. See id. (“When machinery breaks down or becomes clogged or fouled because of the lack of cleaning, the loading process stops until the difficulty is cured.”). Thus, an individual who prevents that stoppage is covered under the LHWCA because his work is integral to maintaining a smooth loading and unloading process. The concurrence turns this objective — to prevent stoppages in loading and unloading — on its head by essentially requiring the process to stop before an employee’s work is integral. Certainly, if Evergreen repaired none of their containers until they were so broken as to spill cargo during the loading or unloading process, that process would stop. That Evergreen has made the prudent business decision to prevent such occurrences should not deprive its contracted workers of LHWCA coverage.
IV.
The Winchester en banc court adopted an approach that gave effect to each part of the statute, relied on definitions of the statutory terms that are consistent with congressional intent, and abided by the Supreme Court’s guidance to take an expansive view of the post-1972 coverage provisions. Beyond Petitioner’s obvious disenchantment with the ALJ’s granting relief to Zepeda, I see no reason to overrule our precedent. Similarly, the ALJ’s finding that Zepeda was a covered maritime worker was well supported by precedent. For the reasons above, I am satisfied that no changes to the maritime industry or other societal forces compel the conclusion that our precedent as to situs should be overturned or that we should construct a new test for determining status.

. Under the Act, compensation is owed for the disability or death of an employee where the injury causing such death or disability occurs "upon the navigable waters of the United States (including any adjoining pier, wharf, dry dock, terminal, building way, marine railway, or other adjoining area customarily used by an employer in loading, unloading, repairing, dismantling, or building a vessel).” 33 U.S.C. § 903(a) (emphasis added).

. This is the factual background presented by Winchester, 632 F.2d at 506-07. See also Parker v. Dir., Office of Workers' Comp. Programs, 75 F.3d 929 (4th Cir.1996), rejected on other grounds by Ingalls Shipbldg., Inc. v. Dir., Office of Workers’ Comp. Programs, 519 U.S. 248, 117 S.Ct. 796, 136 L.Ed.2d 736 (1997) (concluding facility was not a covered situs where state had terminated employer's lease for part of the terminal, forcing employer to locate part of its facility one mile from navigable waters, even though maritime employees traveled between the terminal facility and the off-site facility).

. Brady-Hamilton Stevedore Co. v. Herron, 568 F.2d 137, 139 (9th Cir.1978).