# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

April 29, 2013

No. 11-60057

Lyle W. Cayce
Clerk

NEW ORLEANS DEPOT SERVICES, INCORPORATED,

Petitioner

v.

DIRECTOR, OFFICE OF WORKER'S COMPENSATION PROGRAMS, U. S. DEPARTMENT OF LABOR; NEW ORLEANS MARINE CONTRACTORS; SIGNAL MUTUAL INDEMNITY ASSOCIATION LIMITED,

Respondents

Appeal from the Benefits Review Board
BRB No. 10-0221

Before STEWART, Chief Judge, and KING, JOLLY, DAVIS, JONES, SMITH, DENNIS, CLEMENT, PRADO, OWEN, ELROD, SOUTHWICK, HAYNES, GRAVES, and HIGGINSON, Circuit Judges.

W. EUGENE DAVIS, Circuit Judge:

In this case, we review the determination of the Benefits Review Board ("BRB") that the claimant, Juan Zepeda, was entitled to compensation benefits under the Longshore and Harbor Workers' Compensation Act ("LHWCA" or "the Act"), from Petitioner New Orleans Depot Services, Inc. ("NODSI").

In particular, the BRB found that the claimant's employment activities with NODSI took place in an area or location "adjoining" navigable waters

No. 11-60057

"customarily used by an employer in loading [or] unloading . . . a vessel"[1] and therefore NODSI's facility met the situs requirement of the Act.  We conclude that because the NODSI facility where Mr. Zepeda  worked did not border on navigable waters, it was not a covered situs and Mr. Zepeda is entitled to no benefits under the Act from Petitioner NODSI.  We therefore vacate the award of the BRB as against NODSI and remand for further proceedings.

## I. Facts

The claimant, Mr. Zepeda, filed a claim for LHWCA benefits against one of his prior employers, New Orleans Marine Contractors ("NOMC"), to recover benefits for his hearing loss due to continuous exposure to loud noises.  As a defense, NOMC contended that NODSI was a subsequent maritime employer and that NODSI rather than NOMC was therefore the responsible party.[2]  The issue then presented to the Administrative Law Judge ("ALJ") and BRB was whether NODSI was responsible as a subsequent employer for benefits under the LHWCA.  NOMC then, in effect, prosecuted Mr. Zepeda's claim against NODSI so that NOMC would avoid its liability to him.

Following his employment with NOMC, Mr. Zepeda was employed by the Petitioner, NODSI, at its "Chef Yard" facility on the Chef Menteur Highway in New Orleans.  NODSI and its employees were engaged in the repair,

---

[1] 33 U.S.C. § 903(a) provides:

> [C]ompensation shall be payable under this chapter in respect of disability or death of an employee, but only if the disability or death results from an injury occurring upon the navigable waters of the United States (including any adjoining pier, wharf, dry dock, terminal, building way, marine railway, or other adjoining area customarily used by an employer in loading, unloading, repairing, dismantling, or building a vessel).

[2] "When the disability arises from an 'occupational injury' incurred while working for different employers, the last employer who exposes the claimant to the injury-causing condition may be responsible for all of the benefits." FRANK L. MARAIST ET AL., ADMIRALTY IN A NUTSHELL 291 (6th ed. 2010) (citing *Avondale Indus., Inc. v. DOWCP,* 977 F.2d 186 (5th Cir. 1992)).

maintenance, and storage of shipping containers and chassis.[3]  Some of the containers had been used to transport ocean cargo.  NODSI had more than one facility, but the Chef Yard facility is the only facility relevant to this appeal.  The Chef Yard, with access to the Chef Menteur Highway and rail transportation, can best be described as a small industrial park.  The Chef Yard is located approximately 300 yards from the Intracoastal Canal and is surrounded by a carwash, a radiator shop, an automobile repair shop, a bottling company, and a company that manufactures boxes.  The bottling company's facility is located between the Intracoastal Waterway and the Chef Yard.

NODSI employees worked only within NODSI's facility as they repaired or performed maintenance on containers and chassis.  They had no access to the Intracoastal Canal and all of the equipment NODSI serviced was delivered to the Chef Yard by truck.  Once NODSI completed repairs to the equipment, it was picked up by truck or rail, and no containers were loaded with cargo while in NODSI's custody.

## II.  Procedural Background

The ALJ, after conducting a hearing in this case, found that some of the containers repaired and maintained by NODSI employees had been used for marine transportation and off-loaded at the port of New Orleans.  Representatives of Evergreen, NODSI's customer, also stated that at least some of the containers would be returned to service as marine containers.  The ALJ concluded that the NODSI Chef Yard employees' work repairing ocean containers was "a process which was a significant maritime activity" necessary to loading and unloading cargo.  In addition, the ALJ concluded that the location of the NODSI Chef Yard located some 300 yards from the Intracoastal Canal

---

[3] A chassis is what we ordinarily consider the trailer portion of the 18-wheeler unit on which shipping containers are loaded and transported by truck.

satisfied the situs requirement that the injury occur in an area "adjoining navigable waters." Also, the ALJ found that the repair work and maintenance Mr. Zepeda performed on these containers was closely related to loading or unloading vessels and constituted "maritime employment" which satisfied the status test under the Act.

The BRB affirmed the ALJ's order and a divided panel of this court affirmed the BRB. We then voted this case en banc, primarily to consider the BRB's determination that Mr. Zepeda was injured in an area "adjoining navigable waters" so as to satisfy the Act's situs test.

### III. Standard of Review

Because the LHWCA situs inquiry requires the application of a statutory standard to case-specific facts, it is ordinarily a mixed question of law and fact. However, where, as in this case, the facts are not in dispute, "[LHWCA] coverage is an issue of statutory construction and legislative intent," and should be reviewed as a pure question of law. *See DOWCP v. Perini North River Associates*, 459 U.S. 297, 300, 305 (1983). We therefore review the BRB's determination of coverage under the LHWCA in this case *de novo. Equitable Equip. Co. v. DOWCP*, 191 F.3d 630, 631 (5th Cir. 1999) (citation omitted).

### IV. Analysis

### A.

Before turning to the merits of this appeal, we first consider a preliminary objection the Respondent raises. The Director argues that NODSI has waived the argument that Mr. Zepeda failed to establish that he met the situs requirement of the Act—*i.e.*, that his injury occurred in an area "adjoining navigable waters"—by failing to raise it before the BRB or the panel of this court that heard the appeal. Specifically, the Director argues that NODSI cannot

No. 11-60057

argue that this en banc Court should adopt a new interpretation of "adjoining" when it failed to make the argument before two previous tribunals.

Generally, we do not consider issues on appeal that were not presented and argued before the lower court. *See Lampton v. Diaz*, 639 F.3d 223, 227 n.14 (5th Cir. 2011). "The waiver rule exists to prevent an appellate court from '[analyzing] the facts of a particular [issue] without the benefit of a full record or lower court determination.'" *Id.*[4] In its opening brief to the panel of this court that initially heard the appeal, NODSI only challenged the functional component[5] of the situs requirement and acknowledged that our caselaw foreclosed consideration of the geographic component.[6] However, this is not a case in which a party has wholly ignored a major issue. The issue of LHWCA situs has been contested throughout the case's history, with the proper application of "adjoining area" being squarely addressed by both the ALJ and the BRB. NODSI's recognition of the fact that it was bound by this Court's current interpretation of "adjoining" does not deprive us of the right to visit the issue.

Moreover, a well-settled discretionary exception to the waiver rule exists where a disputed issue concerns "a pure question of law." *Texas v. United States*, 730 F.2d 339, 358 n.35 (5th Cir. 1984); *see also Atl. Mut. Ins. Co. v. Truck Ins. Exch.*, 797 F.2d 1288, 1293 (5th Cir. 1986). In this case, the ALJ, after a full hearing, resolved the factual disputes presented by the parties. At the hearing, witnesses testified about the nature of the industrial park where NODSI's operations were conducted, the nature of NODSI's work, and the relationship of

---

[4] (Alterations in original) (quoting 19 JAMES W. MOORE ET AL., MOORE'S FEDERAL PRACTICE § 205.05[1], at 205–57 (3d ed. 2011) (quoting *Yee v. City of Escondido*, 503 U.S. 519, 538 (1992))).

[5] The injury must occur in an area "customarily used by an employer in loading, unloading, repairing, dismantling, or building a vessel." *See* 33 U.S.C. § 903(a).

[6] The injury must occur "upon the navigable waters of the United States . . . or other adjoining area." *See* 33 U.S.C. § 903(a).

the work to maritime activities. The evidence was undisputed that NODSI's Chef Yard is located about 300 yards from the Intracoastal Canal, and that a bottling plant is located on the tract of land between the Canal and NODSI's yard.

Because the legal issue of whether the location of the claimant's injury "adjoined" navigable waters was presented to the ALJ and the facts involving this issue were fully litigated before the ALJ, we are left with a pure question of law to decide. Moreover, every party was provided an adequate opportunity to brief and argue the issue before the en banc court. Therefore, notwithstanding NODSI's failure to challenge our governing precedent before the BRB or our panel, we exercise our discretion to decide this legal issue: whether, under these undisputed facts, claimant was injured in an area adjoining navigable waters so as to satisfy the LHWCA situs requirement. We now turn to the merits of the appeal.

**B.**

Before 1972, coverage under the LHWCA was provided only if the injury occurred on navigable waters. This "situs" requirement was strictly enforced.[7] However, by its nature, loading and unloading a vessel required a longshoreman to continuously go from ship to wharf and back again, and a longshoreman might work part of the day aboard the ship and the rest of the day on the pier.[8] Similar movement by workers from vessel to dock also occurred in vessel repair work. When Congress made extensive amendments to the Act in 1972, it expressed

[7] *See, e.g., Victory Carriers, Inc. v. Law*, 404 U.S. 202, 209–12 (1971) (longshoreman injured on pier while operating cargo forklift not in covered situs); *Nacirema Operating Co. v. Johnson*, 396 U.S. 212, 223 (1969) (longshoremen injured on pier while attaching cargo to ship's cranes not in covered situs).

[8] *See Ne. Marine Terminal Co. v. Caputo*, 432 U.S. 249, 272–74 (1977).

concern about longshoremen walking in and out of coverage and, to meet this concern, broadened coverage by amending LHWCA § 903(a).[9]

Congress made another change in the 1972 amendments by adding a status requirement, thus limiting LHWCA coverage to traditional maritime occupations. This was accomplished by defining a covered "employee" as "any person engaged in maritime employment, including any longshoreman or other person engaged in longshoring operations, and any harbor-worker including a ship repairman, shipbuilder, and ship-breaker." 33 U.S.C. § 902(3).

The Supreme Court has made it clear that "situs" and "status" are separate, independent elements and that a claimant must establish both elements to recover benefits.[10]

## C.

The LHWCA only extends coverage to "injur[ies] occurring upon the navigable waters of the United States (including any adjoining pier, wharf . . . or *other adjoining area* customarily used by an employer in loading, unloading, repairing, dismantling, or building a vessel)." 33 U.S.C. § 903(a) (emphasis added).

Most courts addressing this issue understand that an "other adjoining area" must satisfy two distinct situs components: (1) a geographic component (the area must adjoin navigable waters) and (2) a functional component (the area must be "customarily used by an employer in loading [or] unloading . . . a

---

[9] Section 903 was amended, in part, to provide compensation "if the disability or death results from an injury occurring upon the navigable waters of the United States (including any adjoining pier, wharf . . . *or other adjoining area customarily used by an employer in loading, unloading, repairing, dismantling, or building a vessel*)." 33 U.S.C. § 903(a) (emphasis added).

[10] *See Herb's Welding, Inc. v. Gray*, 470 U.S. 414, 415–16 (1985); *P.C. Pfeiffer Co. v. Ford*, 444 U.S. 69, 73–74 (1979); *see also King v. Universal Elec. Constr.*, 799 F.2d 1073, 1073–74 (5th Cir. 1986); *Valladolid v. Pac. Operations Offshore, LLP*, 604 F.3d 1126, 1140 (9th Cir. 2010); *Jonathan Corp. v. Brickhouse*, 142 F.3d 217, 220 (4th Cir. 1998).

vessel").[11]  We took this case en banc primarily to decide whether the claimant was injured in an area "adjoining" navigable waters.

In 1980, our en banc court interpreted the geographic component of situs in *Texports Stevedore Co. v. Winchester,* 632 F.2d 504 (5th Cir. 1980) (en banc). In that case, Mr. Winchester was injured when he fell in his employer's gear room.  He and others at that facility were engaged in repairing and maintaining gear used by longshoremen in loading and unloading vessels.  The gear room in question was located five blocks from the gate of the nearest Houston port dock. In holding that the employee met the situs requirement and was entitled to benefits, the court stated:

> Although "adjoin" can be defined as "contiguous to" or "to border upon," it also is defined as "to be close to" or "to be near." "Adjoining" can mean "neighboring."  To instill in the term its broader meanings is in keeping with the spirit of the congressional purposes.  So long as the site is close to or in the vicinity of navigable waters, or in a neighboring area, an employee's injury can come within the LHWA.  To require absolute contiguity would be to reenact the hard lines that caused longshoremen to move continually in and out of coverage.

*Id.* at 514 (footnotes omitted).

The *Winchester* court stressed the desirability of avoiding any hard line for defining what is "adjoining."  Rather, "[t]he situs requirement compels a factual determination that cannot be hedged by the labels placed on an area."  *Id.* at 513. "The best way to effectuate the congressional purposes is to determine the situs question by looking at all the circumstances."  *Id.*  Other than these vague instructions, the court provided little guidance to other courts or future litigants on how to determine from "the circumstances" whether a claimant satisfies the

---

[11] *See, e.g., Coastal Prod. Servs. Inc. v. Hudson*, 555 F.3d 426, 432 (5th Cir. 2009); *Sidwell v. Express Container Servs., Inc.*, 71 F.3d 1134, 1139 (4th Cir. 1995); *Hurston v. DOWCP*, 989 F.2d 1547, 1549 (9th Cir. 1993).

situs test. This is apparent from the court's statement: "[O]uter limits of the maritime area will not be extended to extremes. We would not extend coverage in this case to downtown Houston. The site must have some nexus with the waterfront."[12] *Id.* at 514. The court then concluded that the injured employee was within a situs protected by the LHWCA. *Id.* at 516. We have followed the *Winchester* analysis in a number of cases.[13]

Our sister circuits have taken varying positions on the interpretation of "other adjoining areas."

In *Brady-Hamilton Stevedore Co. v. Herron*, 568 F.2d 137, 139 (9th Cir. 1978), an employee was injured while unloading steel plates from a truck parked at the employer's gear locker, located some 2,600 feet north of the Columbia River and outside the entrance gate of the port of Longview. The Ninth Circuit concluded:

> [T]he phrase "adjoining area" should be read to describe a functional relationship that does not in all cases depend upon physical contiguity. Consideration should be given to the following factors, among others, in determining whether or not a site is an "adjoining area" under section 903(a): the particular suitability of the site for the maritime uses referred to in the statute; whether adjoining properties are devoted primarily to uses in maritime commerce; the proximity of the site to the waterway; and whether the site is as close to the waterway as is feasible given all of the circumstances in the case.

---

[12] At oral argument, we learned that the port of Houston is approximately 5 miles from downtown Houston. Counsel for the Director was unable to tell us how the claimant or the employer would determine—short of trial—whether, in *Winchester,* if the injury had occurred 1 mile or 2 miles from the port of Houston, the claimant would have been injured in an area adjoining navigable waters.

[13] *See Coastal Prod. Servs. Inc.*, 555 F.3d at 432–37; *Reynolds v. Ingalls Shipbuilding Div., Litton Sys., Inc.*, 788 F.2d 264, 272 (5th Cir. 1986), *overruled on other grounds by Stewart v. Dutra Const. Co.*, 543 U.S. 481, 496 (2005); *Alford v. Am. Bridge Div. U.S. Steel Corp.*, 642 F.2d 807, 814 (5th Cir. 1981), *vacated in part on reh'g*, 655 F.2d 86.

No. 11-60057

*Id.* at 141.[14]

In *Sea-Land Service, Inc. v. DOWCP*, 540 F.2d 629 (3d Cir. 1976), an employee was using a truck to move cargo that had been unloaded from a vessel to a building, so it could be further transported to a more permanent location. The employee was injured on a public street in an area outside the terminal that was not under the employer's control. *Id.* at 632. The court held that the restriction on coverage to an "other adjoining area" did not preclude coverage to this employee. The court found situs had been established and stated, "[t]he key is the functional relationship of the employee's activity to maritime transportation, as distinguished from such land-based activities as trucking, railroading or warehousing."[15] *Id.* at 638.

In contrast, the Fourth Circuit has taken a much different approach—an approach that adheres more faithfully to the plain language of the statute. In *Sidwell v. Express Container Services, Inc.*, 71 F.3d 1134 (4th Cir. 1995), the facts were almost identical to the facts in the instant case. The plaintiff was a shipping container mechanic who sought to recover benefits under the Act after he was injured while repairing a container. *Id.* at 1135. His injury occurred at his employer's facility located approximately .8 miles from the closest ship terminal in an area with diverse, non-maritime commercial and residential facilities. *Id.*

---

[14] In *Cunningham v. DOWCP*, 377 F.3d 98, 101 (1st Cir. 2004), the First Circuit considered coverage for an injury to a pipe fitter who worked at the manufacturing facility of his employer located some 3.5 miles from the employer's shipyards where pipe units were installed on ships. The court held that it had not determined a methodology for approaching the question of "adjoining area," but assumed the correctness of the Ninth Circuit's broad approach because it was clear that LHWCA coverage was foreclosed in any case. *Id.* at 105.

[15] The Supreme Court, in *Northeast Marine*, criticized this opinion when it stated: "The [Third] Circuit appears to have essentially discarded the situs test, holding that only '(an) employment nexus (status) with marine activity is (necessary)' and that the situs of the maritime employee at the time of injury is irrelevant." 432 U.S. at 278 n.40 (quoting *Sea-Land Servs., Inc.*, 540 F.2d at 638) (citations omitted).

No. 11-60057

In deciding whether the employer's container repair facility was an "adjoining area," the Fourth Circuit recognized that the Supreme Court had not defined the term, but that the Third, Fifth, and Ninth Circuits had each adopted expansive, yet differing approaches. *Id.* at 1136–37. After reviewing these cases, the *Sidwell* court stated, "Because none of these proffered tests even purports to follow the language of the statute—indeed, for the most part they all openly disavow the statutory text—we decline to adopt any of these tests." *Id.* at 1138. The court held:

> The plain language of the LHWCA requires that covered situses actually "adjoin" navigable waters, not . . . that they merely be in "the general geographic proximity" of the waterfront. Because Congress did not specify a more technical definition of the word "adjoining" (if that is even possible), we must accord that word its ordinary meaning, as, incidentally, the legislative history confirms Congress intended. To be sure, dictionaries do include "neighboring" and "in the vicinity of" as possible definitions of "adjoining," but such is not the ordinary meaning of the word; rather, the ordinary meaning of "adjoin" is "to lie next to," to "be in contact with," to "abut upon," or to be "touching or bounding at some point."

*Id.* (footnotes omitted) (citations omitted).

The *Sidwell* court found support for its interpretation from the House Report on the 1972 amendments: "The bill also expands the coverage of this Act to cover injuries occurring in the *contiguous* dock area related to longshore and ship repair work."[16]

Responding to the argument that the word "adjoining" should be given a broad meaning so as to accommodate Congress's concerns about workers moving in and out of coverage, the *Sidwell* court stated:

> The LHWCA was enacted to address a specific problem, and the actual language that Congress chose does just that. The problem, as we have explained, was that longshorem[e]n loading and

---

[16] S. Rep. No.92-1125, 92d Cong., 2d Sess. 2 (1972) (emphasis added).

unloading ships walked in and out of LHWCA coverage as they walked the gangplank from ship to shore. In response, Congress extended coverage to both navigable waters and "the adjoining land area," S. Rep. 92-1125, 92d Cong., 2d Sess. 13 (1972), so that the longshoremen at both ends of the gangplank would be covered equally by the LHWCA. As the Supreme Court has repeatedly stated, "Congress intended that a worker's eligibility for federal benefits would not depend upon whether he was injured while walking down a gangway or while taking his first step onto the land", *P.C. Pfeiffer*, 444 U.S. at 75; rather, coverage would extend to "the waterfront areas where the overall loading and unloading process occurs." *Northeast Marine,* 432 U.S. at 272; *see also Herb's Welding*, 470 U.S. at 423 (explaining that Congress expanded coverage to include "rather large *shoreside* areas" (emphasis added)). The definition we adopt today ensures coverage for all maritime employees injured in the waterfront areas where the loading, unloading, and repair of vessels occurs, as Congress plainly intended and as the Supreme Court has directed.

*Id.* at 1140.

The court made clear that its literal definition of adjoining could not be circumvented by a broad interpretation of "area."

Thus, an "other adjoining area" as to which coverage extends must be *like* a "pier," "wharf," "dry dock," "terminal," "building way," or "marine railway." Each of these enumerated "areas" is a discrete structure or facility, the very *raison d'etre* of which is its use in connection with navigable waters. Therefore, in order for an area to constitute an "other area" under the statute, it must be a discrete shoreside structure or facility.

*Id.* at 1139 (emphasis in original) (footnote omitted).

The court also indicated that it is the parcel of land underlying the employer's facility that must adjoin navigable waters, not the particular part of that parcel upon which a claimant is injured. The court quoted our language in *Alabama Dry Dock & Shipbuilding Co. v. Kiniess* to demonstrate this point:

[The back lot upon which a crane was located by which claimant was injured was somewhere] from 150 to 2,000 feet from the water's

No. 11-60057

edge. In any event, the physical distance is not decisive here. The test is whether the situs is within a contiguous shipbuilding area which adjoins the water. Alabama Dry Dock's shipyard adjoins the water. The lot was part of the shipyard, and was not separated from the waters by facilities not used for shipbuilding.

*Id.* at 1140 n.11 (alteration in original) (quoting *Ala. Dry Dock*, 554 F.2d 176, 178 (5th Cir. 1977)).

Finally, the *Sidwell* court determined that Congress further restricted the definition of "situs" by requiring the area to be: "customarily used by an employer in loading, unloading, repairing, dismantling, or building a vessel." 33 U.S.C. § 903(a). An "other adjoining area" seeking coverage as an LHWCA-covered situs must therefore satisfy both a geographic and a functional component. The court criticized other circuit courts such as the Third Circuit *Sea-Land* court, which suggested that the functional component (an area customarily used for designated maritime purposes) should be dispositive of the situs inquiry. The court stated:

> This language, however, is a *further* restriction upon "other adjoining areas"—implying that there are areas adjoining navigable waters that nonetheless do not meet the situs requirement because they are not customarily so used—not an implicit elimination of the requirement that the area first be adjoining navigable waters.[17] In any event, reading the language in the manner proposed by the Director collapses the separate status and situs requirements into a single inquiry into status, in contravention of the Supreme Court's injunctions in *Herb's Welding* and *P.C. Pfeiffer* that we not read the status and situs requirements as one and the same.

*Sidwell*, 71 F.3d at 1139–40 n.10 (citations omitted).

---

[17] We disagree with *Winchester*'s holding that even an injury that occurred in a facility that did not border on navigable waters nevertheless satisfied the situs test if the "area" was customarily used for loading and unloading or some other designated maritime purpose. *See Winchester*, 632 F.2d at 515.

13

No. 11-60057

In response to *Sidwell*'s reasoning, the Director has advanced two primary arguments for avoiding the plain meaning of "adjoining." First, the Director argues that a broad definition of "adjoin" furthers the congressional goal of preventing longshoremen from walking in and out of coverage. By reading "adjoining" broadly, longshoremen would less frequently exit and enter the perimeters of LHWCA coverage. However, as the *Sidwell* court explained, Congress's primary concern was that longshoremen constantly walked the gangplank between the ship and the dock so that the worker injured on the dock was not covered under the LHWCA and his co-worker injured on the ship was covered. This loss of coverage when a longshoreman crossed the ship's gangplank was the inequity Congress sought to cure.[18]

Moreover, by adopting a situs requirement, Congress obviously recognized that a longshoreman could still leave and re-enter the geographic bounds of LHWCA coverage. As the Court in *Herb's Welding* stated: "[T]here will always be a boundary to coverage, and there will always be people who cross it during their employment. If that phenomenon was enough to require coverage, the Act would have to reach much further than anyone argues that it does or should." 470 U.S. at 426–27 (citation omitted).

The Director also argues that as a compensation statute, the LHWCA should be construed liberally in favor of coverage. *See Ne. Marine*, 432 U.S. at 268. However, the first rule of statutory construction is that we may not ignore the plain language of a statute. *See Matter of Appletree Markets, Inc.*, 19 F.3d 969, 974 (5th Cir. 1994) ("[T]o ignore the plain language of the statute would be to substitute improperly our own policy predilections for the express intent of

---

[18] *See P.C. Pfeiffer Co.,* 444 U.S. at 75 ("By enlarging the covered situs . . . , Congress intended that a worker's eligibility for federal benefits would not depend on whether he was injured while walking down a gangway or while taking his first step onto the land."); *see also Chesapeake & Ohio Ry. Co. v. Schwalb*, 493 U.S. 40, 46 (1989).

14

Congress."). The LHWCA dictates that a covered situs actually adjoin navigable waters, and we may not ignore this limitation.

## V. Conclusion

For the reasons stated above, we adopt the *Sidwell* definition of "adjoining" navigable water to mean "border on" or "be contiguous with" navigable waters.[19] We, therefore, overrule the contrary definition and analysis of *Winchester* and its progeny inconsistent with this opinion. We adopt this definition primarily because it is more faithful to the plain language of the statute. We are also influenced by the fact that the vague definition of "adjoining" we adopted thirty years ago in *Winchester* provides litigants and courts, in cases such as this one, with little guidance in determining whether coverage is provided by the Act.[20] More than perhaps any other statutory scheme, a worker's compensation statute should be "geared toward a nonlitigious, speedy, sure resolution of the compensation claims of injured workers." *Winchester*, 632 F.2d at 518 (Tjoflat, J., dissenting). One could hardly imagine an area where predictability is more important.

Applying the *Sidwell* definition of "adjoining" to the instant case, there is no dispute that the Chef Yard where Mr. Zepeda's injury occurred did not adjoin navigable waters. Because the Chef Yard did not border upon and was not contiguous with navigable waters, it is not an LHWCA-covered situs.[21]

---

[19] *See also* BRYAN GARNER, GARNER'S DICTIONARY OF LEGAL USAGE 25 (3d ed. 2011) ("Etymologically, *adjoining* means 'directly abutting; contiguous' . . . .").

[20] Also, as demonstrated by this case, our former vague definition of "adjoining area" makes it difficult for an employer to know whether it should purchase insurance coverage for injuries under the Act.

[21] Because we determine that the Act's situs requirement is not satisfied in this case, we need not address the question of whether Mr. Zepeda's employment activities would satisfy the Act's status requirement.

No. 11-60057

For these reasons we VACATE the award of the BRB against NODSI and REMAND for further proceedings as necessary against the alternate employer, New Orleans Marine Contractors.

VACATED AND REMANDED.

No. 11-60057

EDITH BROWN CLEMENT, Circuit Judge, with whom JOLLY, JONES, SMITH, PRADO, OWEN, and ELROD, Circuit Judges, join, concurring:

I fully concur in the majority's formulation of the situs inquiry, finding it to be a faithful application of the plain text of the LHWCA. I write separately to explain why the status requirement is not met in this case, even under the generous precedent established by this circuit and the Supreme Court.

This en banc decision to return the situs inquiry to its textual roots will certainly impose a natural limitation on the status of employees who are eligible under the LHWCA. But both Congress and the Supreme Court have acknowledged that the situs and status inquiries are separate and distinct, and that a claimant must establish both before he can recover under the LHWCA. *See, e.g.*, 33 U.S.C. §§ 903(a), 902(3); *Herb's Welding, Inc. v. Gray*, 470 U.S. 414, 415–16 (1985). It is important to clarify the status test to ensure that this circuit's application of the LHWCA as a whole remains true to its proper purpose. As the status inquiry provides an alternative ground to vacate the decision of the Benefits Review Board, this discussion is not dictum. *U.S. v. Potts*, 644 F.3d 233, 237 n.3 (5th Cir. 2011) (explaining that an alternative holding is binding precedent).[1]

## I. Controlling Precedent

An individual located on a proper situs will qualify as a covered employee under the LHWCA only if he is also "engaged in maritime employment." 33 U.S.C. § 902(3). This statute provides that, for example, "any longshoreman or other person engaged in longshoring operations, and any harbor-worker including a ship repairman, shipbuilder, and ship-breaker," has the status of a maritime employee. *Id.* The Supreme Court has acknowledged that the Act also

---

[1] Prior to this en banc decision, the situs inquiry was often used to bolster and provide context for the status inquiry. The change in the nature of the situs inquiry provides an additional reason to clarify the proper formulation of the status inquiry.

17

extends to cover workers other than those in the delineated occupations, *Chesapeake & Ohio Ry. Co. v. Schwalb*, 493 U.S. 40, 45 (1989), as long as the worker is "engaged in loading, unloading, repairing, or building a vessel." *P.C. Pfeiffer Co. v. Ford*, 444 U.S. 69, 79 (1979) (quoting S. Rep. No. 92-1125 (1972) and H.R.Rep. No. 92-1441 (1972)).

As acknowledged in *Chesapeake & Ohio Railway Co. v. Schwalb*, "the maritime employment requirement as applied to land-based work other than longshoring and the other occupations named in § 902(3) is an occupational test focusing on loading and unloading. Those not involved in those functions do not have the benefit of the Act." 493 U.S. at 46 (citing *Herb's Welding*, 470 U.S. at 424). In the context of the LHWCA, loading and unloading includes those tasks incident to the process of "handling of cargo as it moves between sea and land transportation," *Ne. Marine Terminal Co., Inc. v. Caputo*, 432 U.S. 249, 267, 273–74 (1977), because such tasks are of the sort traditionally performed by longshoremen, *see Ford*, 444 U.S. at 74, 81–82. Thus, "land-based activity occurring within the § 903 situs will be deemed maritime . . . if it is an *integral* or *essential* part of loading or unloading a vessel," viewed from the position of a longshoreman or harborworker. *Schwalb*, 493 U.S. at 45 (emphasis added). Maritime employment does not extend to workers "beyond those actually involved in moving cargo between ship and land transportation." *Herb's Welding*, 470 U.S. at 424.

In *Schwalb,* the Supreme Court recognized that "employees who are injured while maintaining or repairing equipment essential to the loading or unloading process," in addition to longshoremen who physically handle cargo, are covered by the LHWCA. 493 U.S. at 47. It premised this conclusion on the fact that the process of loading and unloading vessels would stop if the machinery used by the longshoremen became broken, clogged, or fouled. An individual who either fixed that machinery or ensured that such a breakdown

did not occur was "just as vital to and an integral part of the loading process as the operator of the equipment," *id.*, sufficient to trigger application of the LHWCA.

This circuit applied a version of this test in *Hullinghorst Indus., Inc. v. Carroll*, 650 F.2d 750, 754–58 (5th Cir. 1981), to hold that a carpenter injured while building scaffolding beneath a pier was a maritime employee for purposes of the LHWCA. Although the carpenter had no direct involvement in loading or unloading, his scaffolding work "was an integral step in a maritime project of the type that could be performed by a typical harborworker," and "directly furthered . . . the loading and unloading of ships" by enabling the owner of the pier to perform its core longshoring operations. *Id.* at 756. Because a loading company would have otherwise had to provide for the repair of its piers, an employee engaged in that activity was covered under the LHWCA even if he was employed as an independent contractor. *See id.* at 757–58.

## II. Discussion

Juan Zepeda was not involved in the process of moving cargo between ship and land transportation. His task was to repair empty containers, some of which may have been used in maritime shipping. The now-vacated panel opinion nevertheless concluded that, because containers themselves are "integral" or "essential" to the loading process, the repair of such containers triggered application of the LHWCA. *See Schwalb*, 493 U.S. at 45 ("[L]and-based activity occurring within the § 903 situs will be deemed maritime only if it is an integral or essential part of loading or unloading a vessel.").

Although this conclusion is not an unreasonable interpretation of "integral" and "essential" as those words are understood on their own, the panel opinion as a whole divorces *Schwalb* and its predecessors from their roots. *Schwalb* stands for the proposition that employees who repair equipment used by longshoremen to load or unload vessels are just as essential to the loading

process as the individuals who load or unload the cargo, because the actual process, once begun, would be arrested in the absence of their contributions. *See id.* at 48 (noting the "determinative consideration" was that the "ship loading process could not continue" in the absence of the repair). Because these workers repair the tools and instrumentalities that longshoremen rely on to execute their tasks, they are "engaged in the type of duties that longshoremen perform in transferring goods between ship and land transportation," *Ford*, 444 U.S. at 81, and covered by the LHWCA.

On its own terms and against the backdrop of *Caputo*, *Ford*, and *Herb's Welding*, *Schwalb* does not create a rule under which *all* employees who repair *any* equipment that *may* be used in the loading process are similarly integral. If this were the inquiry, it would only be a short step to the conclusion that a manufacturer of shoes or walkie talkies should be covered, because, arguably, the modern loading process cannot be accomplished without those items. But the LHWCA does not provide a but-for test for determining coverage. Instead, the statute looks to the customary maritime functions of dockworkers, albeit without an eye toward who is actually performing those functions. *See Schwalb*, 493 U.S. at 46; *Ford*, 444 U.S. at 81–82; *Caputo*, 432 U.S. at 273–74. With this understanding, the proper question when defining the status of an employee under the LHWCA is whether the task that the employee engages in is the type of customary maritime work that a dockworker or longshoreman would have to perform in order to successfully transfer cargo between ship and land transportation. *See Ford*, 444 U.S. at 81.

This inquiry distinguishes tasks necessary to execute a loading process from the perspective of a longshoreman—such as repair of a longshoreman's tools and facilities—from tasks that are only tangentially connected to the loading process. Construed broadly, the first category may capture a person whose sole responsibility is to sweep clear a loading ramp. It may even include

someone who repairs broken dollies in between loading jobs. But it does not include, for example, a manufacturer of cardboard boxes. The way that cargo arrives at port may determine how the loading and unloading process is executed, but nothing about the production of the container is the customary job of a harborworker or longshoreman.[2]

Although container repair is not customarily the task of longshoremen, courts have recognized that container repair satisfies the status test in some instances. For example, the Eleventh Circuit has held that container repair is "integral" or "essential" to the loading process when it "consist[s] of making . . . outbound, loaded chassis road worthy" and when, "[w]ithout the essential maintenance necessary to make the outbound rigs road worthy, the unloading process would stop indefinitely at the Port Authority." *Atl. Container Serv., Inc. v. Coleman*, 904 F.2d 611, 613, 618 (11th Cir. 1990). In other words, container repair satisfies the status inquiry when it is one step in the direct chain of unloading a ship, and when "the maintenance men would [halt] the entire loading process" if they were not available for the repair. *Sea-Land Serv., Inc. v. Rock*, 953 F.2d 56, 67 (3d Cir. 1992) (citing *Coloma v. Dir., Office of Workers' Comp. Programs*, 897 F.2d 394, 400 (9th Cir. 1990)); *accord Schwalb,* 493 U.S. at 48 ("The determinative consideration is that the ship loading process could not continue unless the retarder that Goode worked on was operating properly. It is notable that the loading actually was stopped while Goode made the repairs and that one of his supervisors apparently expressed the desire that Goode hurry up so that the loading could continue."); *Sidwell v. Va. Int'l Terminals, Inc.*, 372 F.3d 238, 243 (4th Cir. 2004) ("This standard makes the capacity to interrupt ongoing longshoring activities paramount.").

---

[2] So stated, this distinction also avoids the red herring argument that what is "integral" to the loading or unloading process depends on the size and financial capabilities of the entity supplying that product or service.

No. 11-60057

However, container repair does not satisfy this standard when it is not of the sort that is, or would have been, traditionally performed by longshoremen or harborworkers. Zepeda's work—the repair of empty containers that were neither headed for delivery nor toward a ship for transport, and indeed may well have been destined for a truck or train rather than a vessel—is clearly of this second character. This was not an instance in which the containers came off of a ship needing repair, and Zepeda was on hand to perform such repairs essential or necessary to ensure that the containers made it to their final destination. Nothing about Zepeda's work was done with the purpose of assisting a longshoreman or harborworker execute his task, and nothing about the maritime nature of the location at which Zepeda worked, even if it was to be considered a proper situs, was functionally related to his repair work. In short, Zepeda's work was not "essential" or "integral" to a longshoreman's task of loading or unloading a vessel, because nothing about Zepeda's work was part of the process of "moving cargo between ship and land transportation." *Herb's Welding*, 470 U.S. at 424.

## III. Conclusion

The LHWCA is to be "liberally construed in conformance with its purpose, and in a way which avoids harsh and incongruous results." *Caputo*, 432 U.S. at 266 (quoting *Voris v. Eikel*, 346 U.S. 328, 333 (1953)). But incongruity is a two-sided inquiry. Zepeda, an individual who never loaded or unloaded a vessel, never assisted anyone else load or unload a vessel, and never witnessed a vessel being loaded or unloaded, is "a far cry from the paradigmatic longshoreman who walked in and out of coverage during his workday and spent substantial amounts of his time 'on navigable waters.'" *Herb's Welding*, 470 U.S. at 427 n.13. Constructing the status inquiry so as to include Zepeda would make application of the Act unwieldy as to those who should be covered, and create a lack of uniformity between individuals such as Zepeda and similarly situated non-maritime employees who are limited to state compensation schemes. Under the

22

precedent defining status established by this circuit and the Supreme Court, I would hold that Zepeda was not a maritime employee for purposes of the LHWCA while employed by NODSI.

No. 11-60057

HIGGINSON, Circuit Judge, concurring in the judgment:

Farsightedly or fortuitously, Congress in 1972 amended the Longshore and Harbor Workers' Compensation Act (Longshore Act), 33 U.S.C. §§ 901–50, legislation that this Court applied in *Textports Stevedore Co. v. Winchester*, 632 F.2d 504 (5th Cir. 1980) (en banc), setting forth a two-part rule that extended benefits coverage to injuries not just on navigable waters, but also at specific "adjoining" facilities ("pier, wharf, dry dock, terminal, building way, marine railway"), as well as any "other adjoining area customarily used by an employer in loading, unloading, repairing, dismantling, or building a vessel." 33 U.S.C. § 903(a). Congress sought to be comprehensive of common shipping facilities, such as piers, docks, and wharfs, as well as other "adjoining" property *provided that* the property is "used by an employer in loading, unloading, repairing, dismantling, or building a vessel." *Id.* Not to restrict coverage to nomenclature, Congress in § 903(a) extended coverage to "other adjoining areas," but again, only if such areas are used for *vessel-related* activities.

In my view, this necessity of proximity to a navigable waterway as well as with the functional requirement that the area is "customarily used for loading, unloading, repairing . . . *a vessel*" (emphasis added), requires reversal in the case before us because the Chef Yard area was not used to load or unload or repair *vessels*. Its use, like many current and under-construction container terminals (some even named "inland ports") was container repair, storage, and transshipment by ground, air, or sea. These container yards do exist to support port, air, and rail gateways, but they have emerged since Congress' amendments to the Longshore Act and we cannot declare that just because of their recent essentiality, they have become areas that load, unload or repair vessels.

This short plain language analysis necessitates reversal in this case because the Benefits Review Board, utilizing dicta from our decision in *Coastal Production Services, Inc. v. Hudson*, 555 F.3d 426 (5th Cir. 2009), that Longshore

24

Act coverage could extend beyond vessel work to more general work "associated with items used as part of the loading process," *id*. at 434, goes beyond Congress' legislation and its purpose, indeed, beyond the reality of cargo shipping prevalent fifty years ago.  It may be that Congress will determine that containers have become the functional equivalent of vessel-loading equipment, like cranes, or are becoming even the functional equivalent of the holds of vessels themselves.  But I do not think  that we enlarge the commonsense meaning of the word "vessel" ourselves.

Consequently, I would reverse the Benefits Review Board decision and clarify that the clause "associated with items used as part of the loading process" in *Hudson* cannot be understood to expand Longshore Act coverage beyond areas that operate to load and repair vessels to areas that operate to store and repair the cargo containers that go onto vessels and trains and trucks.

Deciding this case on the word "vessel," I would not reach whether we would answer differently what the word "adjoin" meant to Congress half a century ago.  Contemporaneous with that syntactical choice, our court, then also sitting en banc, gave its reasoned answer, not withholding Longshore Act coverage when the area of injury was a dock equipment room that, unlike two other gear rooms, was not "on the docks" abutting the water because "the docks had insufficient space for an additional gear room," so it had to be located five blocks away. *Winchester*, 632 F.2d at 507.

I would not disturb our decision in *Winchester* because it is time-settled, *cf. Dickerson v. United States*, 530 U.S. 428 (2000); because it was authored by a majority of judges who were contemporaries with the statute they were interpreting; because that decision, defining "adjoin" as adjacent, is as faithful to Congress' literal instruction as the majority's decision today assigning a strict contiguity meaning; and because the rule propounded by Congress, applied by us in *Winchester*, announced a layered approach which has proven fair and

workable over fifty years of change that always will be the circumstance of longshoreman work.

Even etymologically, I do not think we are in a position to say there is certainty that "adjoin" means contiguousness, not adjacency. Shakespeare spoke of the hills "adjoining" Alexandria. From the standpoint of persons, industry, and legislators, unbroken contiguity to navigable water is impractical for reasons that our court identified in *Winchester* and that are even more pressing today: land abutting water is finite and expensive, yet ship size and cargo capacity, total shipping volume, and loading and offloading equipment are ever-increasing. *See Winchester*, 632 F.2d at 513–14.

Neither the record in this case, nor in any case drawn to our attention, suggests that Congress' layered approach, applied in *Winchester*, has proven unworkable.[1] Indeed, if impracticality or uncertainty or injustice has occurred, Congress would receive and test that proposition in hearings and tighten the interpretation of § 903(a) that we have applied for almost half a century. But no reference to a proposal for legislative action has been drawn to our attention. By contrast, this court in *Winchester*, at the time presiding over port, shipping and longshoreman activity from Florida to Texas, pointed out that a strict abutment rule could exacerbate the very gangplank benefits coverage problem Congress sought to alleviate. 632 F.2d at 514–15. Employers could relocate obvious longshoreman's work across a property break. This in fact was the circumstance in *Winchester*, compelled not by a desire to withhold benefits but simply because there was no more dock space. *Id.* at 507.[2]

---

[1] During oral argument, the *Hudson* case was identified as proof of unpredictability. But in *Hudson*, there was no contiguity problem because the platform where the injury occurred was located entirely at sea. *See* 555 F.3d at 428.

[2] Unsurprisingly, during oral argument to us, the answer candidly was given that rescinding *Winchester* would mean coverage would cease. There is no reason to criticize or call into question that answer. A property break could mean substantial cost savings which would

No. 11-60057

For the above reasons, I concur in the judgment of the court.

_____

be sensible, though the rule behind it would not be.

No. 11-60057

CARL E. STEWART, Chief Judge, dissenting, joined by DENNIS and GRAVES, Circuit Judges:

Over thirty years ago, our en banc court confronted the same issue we confront today: how to interpret the geographic component of the situs test in the Longshore and Harbor Workers' Compensation Act ("LHWCA" or "the Act") and specifically, how to define "adjoining area" under the Act.[1] *Texports Stevedore Co. v. Winchester*, 632 F.2d 504 (5th Cir. 1980) (en banc), *cert denied*, 452 U.S. 905 (1981). The *Winchester* majority adopted a broad definition of "adjoining area" that was in keeping with the plain meaning of the words, as well as "the spirit of the congressional purposes." *Id.* at 514. The decades since *Winchester* was decided have revealed no catastrophic consequences of that decision. Nonetheless, the majority now overrules this precedent and adopts the Fourth Circuit's more restrictive definition of "adjoining area," thereby enhancing an existing circuit split. As I find no compelling reason to alter the LHWCA legal landscape in this circuit, I respectfully dissent.

## I.

To support its adoption of the Fourth Circuit's test, *Sidwell v. Express Container Servs., Inc.*, 71 F.3d 1134 (4th Cir. 1995), the majority advances two arguments critical of *Winchester*: (1) the court provided only vague instructions as to how to analyze the totality of the circumstances; and (2) that the court's interpretation of "adjoining area" is not faithful to the plain language of the LHWCA. I address each argument in turn.

---

[1] Under the Act, compensation is owed for the disability or death of an employee where the injury causing such death or disability occurs "upon the navigable waters of the United States (including any adjoining pier, wharf, dry dock, terminal, building way, marine railway, or *other adjoining area* customarily used by an employer in loading, unloading, repairing, dismantling, or building a vessel)." 33 U.S.C. § 903(a) (emphasis added).

28

No. 11-60057

## A.

The majority criticizes *Winchester* for dispensing "vague instructions [that] provided little guidance to other courts or future litigants on how to determine from 'the circumstances' whether a claimant satisfies the situs test." Slip Op. at 7. However, in the thirty-three years since it was passed, *Winchester* has not proven to be overly vague or unworkable. Indeed, the standard is clear enough that since 1980, there have been only nine cases in this circuit where the meaning of "adjoining area" was contested. Moreover, few of these cases challenged the application of *Winchester* to land-based operations. *Coastal Prod. Servs., Inc. v. Hudson*, 555 F.3d 426 (5th Cir. 2009) (deciding that fixed loading platform was a maritime situs); *Thibodeaux v. Grasso Prod. Mgmt. Inc.*, 370 F.3d 486 (5th Cir. 2004) (holding that a fixed oil production platform was not a covered situs); *Boomtown Belle Casino v. Bazor*, 313 F.3d 300 (5th Cir. 2002) (holding that floating casino was not a covered situs); *E. J. Fields Mach. Works Inc v. Guidry*, 54 F. App'x 793 (5th Cir. 2002) (per curiam) (unpublished) (affirming LHWCA situs status for job shop specializing in the repair and construction of marine parts where shop was one-hundred feet from river and located in area customarily used for maritime activity); *Mobil Mining & Minerals v. Nixson*, 209 F.3d 719 (5th Cir. 2000) (per curiam) (unpublished) (holding injury at premises adjacent to the Houston Ship Channel occurred on a covered situs); *Sisson v. Davis & Sons, Inc.*, 131 F.3d 555 (5th Cir. 1998) (per curiam) (holding that injury in a parking lot did not occur on a covered situs); *Universal Fabricators, Inc. v. Smith*, 878 F.2d 843 (5th Cir. 1989) (upholding ALJ's situs determination where employer's yard adjoined navigable waters); *Reynolds v. Ingalls Shipbldg. Div., Litton Sys., Inc.*, 788 F.2d 264 (5th Cir. 1986) (discussing coverage for seaman injured at sea); *Alford v. Am. Bridge Div., U.S. Steel Corp.*, 642 F.2d 807 (5th Cir. Apr. 1981), *modified in part*, 668 F.2d 791 (5th Cir. Sept. 1981) (holding employer's location on the Sabine River fell within

29

the situs requirement). Additionally, Petitioners have presented no industry reports, data, hearings, or related information to support any alleged negative effects *Winchester* has had on the maritime industry.

In the absence of any compelling evidence of *Winchester*'s dysfunction or change in the maritime industry, I decline to join the majority in overruling well-reasoned precedent of this en banc court that involves carefully-considered statutory interpretation. "[S]*tare decisis* in respect to statutory interpretation has 'special force,' for 'Congress remains free to alter what we have done.'" *John R. Sand & Gravel Co. v. United States*, 552 U.S. 130, 139 (2008) (quoting *Patterson v. McLean Credit Union*, 491 U.S. 164, 172-73 (1989)).

## B.

The majority also reasons that the Fourth Circuit's interpretation of "adjoining area" is more faithful to the plain language of the statute. The *Winchester* Court observed that "adjoin" could be defined as "contiguous to or to border upon," as well as "to be close to or to be near." 632 F.2d at 514 (citation and internal quotation marks omitted). The *Winchester* court chose to adopt the second set of definitions in accordance with its interpretation of congressional intent. *Id.* In repudiating this interpretation, the majority here cites with approval *Sidwell*'s comment that while "dictionaries do include 'neighboring' and 'in the vicinity of' as possible definitions of 'adjoining,' . . . such is not the ordinary meaning of the word." 71 F.3d 1134, 1138.

Webster's Third New International Dictionary defines "adjoining" as "touching or bounding at some point or on some line: near in space." Webster's Third New Int'l Dictionary 27 (1993). Other dictionaries define adjoining similarly—that is, with more than one definition, one of which does not require contiguity. *See, e.g.,* Am. Heritage Dictionary of the English Language 22 (1992) ("neighboring; contiguous"); *but see* Black's Law Dictionary 62 (1968) ("The word in its etymological sense means touching or contiguous, as distinguished from

lying near to or adjacent."). The majority refuses to construe "adjoining area" liberally because "the first rule of statutory construction is that we may not ignore the plain language of the statute." However, this argument does not recognize the multiple ordinary meanings of "adjoining" nor the ambiguity intrinsic in defining how far from shore an "adjacent *area*" extends. Such ambiguities as these may be resolved by applying canons of statutory interpretation, including an analysis of legislative history. *See Perrone v. Gen. Motors Acceptance Corp.*, 232 F.3d 433, 440 (5th Cir. 2000).

Accordingly, the *Winchester* court reasonably—and properly, in my opinion—sought to resolve the issue by looking to congressional intent and Supreme Court precedent. *See, e.g., Winchester*, 632 F.2d at 514-15; *see also Ne. Marine Terminal Co. v. Caputo*, 432 U.S. 249, 261-65 (1977) (describing expansion of LHWCA coverage under 1972 amendments). The *Winchester* court's broad reading of the complete clause, "adjoining area," also was consistent with "[o]ne of the primary motivations for Congress' decision to extend [LHWCA] coverage shoreward," which was the "recognition that the advent of modern cargo-handling techniques had moved much of the longshoreman's work off the vessel and onto land." *Caputo*, 432 U.S. at 269-70. Attendant to this recognition is the practical reality that the amount of land contiguous to the water is limited. Consider the following scenario: A company maintains three gear rooms, all of which are supervised by the same shop foreman. Two of those gear rooms are on the docks, but the third is located a few blocks away from the docks because there was insufficient space for an additional gear room on the docks, and the company could find no space closer to the docks.[2] Under the majority's

---

[2] This is the factual background presented by *Winchester*, 632 F.2d at 506-07. *See also Parker v. Dir., Office of Workers' Comp. Programs*, 75 F.3d 929 (4th Cir. 1996), *rejected on other grounds by Ingalls Shipbldg., Inc. v. Dir., Office of Workers' Comp. Programs*, 519 U.S. 248 (1997) (concluding facility was not a covered situs where state had terminated employer's lease for part of the terminal, forcing employer to locate part of its facility one mile from

strict interpretation of the Act, a worker injured in the gear room on the docks will be covered under the LHWCA, but an identical worker injured under the same circumstances at the off-dock location will not be covered. While I acknowledge that "there will always be a boundary to coverage," *Herb's Welding, Inc. v. Gray*, 470 U.S. 414, 426-27 (1985), I am not convinced Congress intended this type of "harsh and incongruous" result. *Caputo*, 432 U.S. at 268 (citation and internal quotation marks omitted).

Moreover, as Petitioner conceded at oral argument, adopting a narrow definition of "adjoining area" would allow maritime employers to circumvent LHWCA coverage by purchasing land with a narrow gap separating it from the water. *See, e.g., Walker v. Metro Mach. Corp.*, 50 F. App'x 104 (4th Cir. 2002) (per curiam) (unpublished) (declining to disturb ALJ's decision finding facility was not a covered situs because employer's waterfront facility was divided into two areas separated by a fenced-off path owned by the city, and employee was injured in area not contiguous to navigable waters).

## II.

Although the majority discusses the circuit split that exists between the Fourth and Ninth Circuits[3], it fails to observe the extent to which the Fourth Circuit's test is an outlier among circuits that have addressed this issue. No other circuit has adopted *Sidwell*'s restrictive test. Instead, the trend is to adopt a more expansive view of coverage. *See Consolidation Coal Co. v. Benefits Review Bd.*, 629 F.3d 322, 330-31 (3d Cir. 2010) (adopting a liberal reading of "adjoining area" after looking to *Winchester* and the Ninth Circuit, and specifically rejecting the *Sidwell* approach); *Cunningham v. Dir., Office of*

---

navigable waters, even though maritime employees traveled between the terminal facility and the off-site facility).

[3] *Brady-Hamilton Stevedore Co. v. Herron*, 568 F.2d 137, 139 (9th Cir. 1978).

32

*Workers' Comp. Programs*, 377 F.3d 98, 105 (1st Cir. 2004) (assuming without deciding that ALJ and Benefits Review Board were correct to apply Ninth Circuit's approach); *Garvey Grain Co. v. Dir., Office of Workers' Comp. Programs*, 639 F.2d 366, 369-71 (7th Cir. 1981) (applying a "liberal" test following *Caputo*). Additionally, the majority's decision creates a split with the Eleventh Circuit, which continues to apply *Winchester*. *See, e.g., Ramos v. Dir., OWCP*, 486 F. App'x 775 (11th Cir. 2012) (per curiam) (unpublished). Given the importance of maintaining uniformity in maritime law, I disagree with the majority's decision to move away from the more liberal interpretation favored by the majority of circuits that have addressed the issue.

### III.

As I also disagree with Judge Clement's concurrence, I briefly address the key difficulties with her separate opinion.

In addition to the situs requirement already discussed, an injured claimant must also satisfy the status requirement. *See* 33 U.S.C. § 902(3) ("The term 'employee' means any person engaged in maritime employment, including any longshoreman or other person engaged in longshoring operations, and any harbor-worker including a ship repairman, shipbuilder, and ship-breaker . . . ."). The Act does not define "maritime employment," but the Supreme Court has explained that "employees who are injured while maintaining or repairing equipment essential to the loading or unloading process are covered by the Act. . . . Someone who repairs or maintains a piece of loading equipment is just as vital to and an integral part of the loading process as the operator of the equipment." *Chesapeake & Ohio Ry. Co. v. Schwalb*, 493 U.S. 40, 47 (1989).

The concurrence argues that "container repair is not customarily the task of longshoremen . . . ." Concurrence Slip Op. at 5. Respectfully, I disagree. While this statement may have been true many years ago, it does not acknowledge the changes in the maritime industry in the twentieth century that

were reflected in the 1972 amendments to the LHWCA and subsequent Supreme Court precedent. As the Supreme Court recognized thirty-five years ago, "the container is the modern substitute for the hold of the vessel." *Caputo*, 432 U.S. at 270. Moreover, I find it persuasive that the Benefits Review Board decided over thirty years ago that container repair mechanics are engaged in maritime employment. *See, e.g., Cabezas*, 11 Ben. Rev. Bd. Serv. (MB) 279 (1979), *Parker*, 8 Ben. Rev. Bd. Serv. (MB) 321 (1978).

The concurrence then distinguishes between two types of container repair: (1) repair that is "one step in the direct chain of unloading a ship and when 'the maintenance men would [halt] the entire loading process' if they were not available for the repair" and (2) repair "not of the sort that is, or would have been, traditionally performed by longshoremen or harborworkers." Concurrence Slip Op. at 5-6. I find this distinction problematic. The concurrence does not lay out a clear test for this distinction but relies on four characteristics of Zepeda's work to find that he falls into the second category—the containers Zepeda repaired were (1) empty, (2) not headed for delivery, (3) not headed toward a ship for transport, and (4) "may well have been destined for a truck or train rather than a vessel." Concurrence Slip Op. at 6. The concurrence has cited no authority, nor am I aware of any such authority, that would support the adoption of tests requiring a quantitative assessment of a container's contents or a requirement that each individual container an employee works on be tracked from its origin to its ultimate destination. Furthermore, the concurrence's assertions contradict the ALJ's findings, which are "conclusive if supported by substantial evidence in the record considered as a whole." 33 U.S.C. § 921(b)(3). The ALJ found, based on the weight of the evidence, that Zepeda worked on Evergreen marine containers while he was a NODSI employee. There is substantial evidence in the record to support this conclusion, including testimony that (1) some of the Evergreen containers repaired by

34

NODSI were used for marine transportation; (2) some of the containers were offloaded at the Port of New Orleans; (3) it was common for empty containers to be loaded onto and unloaded from ships; (4) NODSI initially only serviced Evergreen containers and was required under Evergreen's labor contract to hire unionized maritime workers who were the only workers permitted to work on marine containers; and (5) when Zepeda began working for NODSI, he was a unionized maritime worker. Repair of marine containers lies within the scope of maritime employment, and the proper functioning of these containers, including maintenance and repair when damage is discovered, is essential to the loading and unloading process. "It is irrelevant that an employee's contribution to the loading process is not continuous or that repair or maintenance is not always needed." *Schwalb*, 493 U.S. at 47.

Finally, the concurrence appears to disregard the need for companies to engage in maintenance and repair before the container condition becomes so degraded as to render it unusable and a physical impediment to the loading or unloading process. The Supreme Court recognized the necessity of continuously maintaining equipment with the goal toward preventing machinery breakage. *See id.* ("When machinery breaks down or becomes clogged or fouled because of the lack of cleaning, the loading process stops until the difficulty is cured."). Thus, an individual who *prevents* that stoppage is covered under the LHWCA because his work is integral to maintaining a smooth loading and unloading process. The concurrence turns this objective—to prevent stoppages in loading and unloading—on its head by essentially requiring the process to stop before an employee's work is integral. Certainly, if Evergreen repaired none of their containers until they were so broken as to spill cargo during the loading or unloading process, that process would stop. That Evergreen has made the prudent business decision to prevent such occurrences should not deprive its contracted workers of LHWCA coverage.

35

No. 11-60057

## IV.

The *Winchester* en banc court adopted an approach that gave effect to each part of the statute, relied on definitions of the statutory terms that are consistent with congressional intent, and abided by the Supreme Court's guidance to take an expansive view of the post-1972 coverage provisions. Beyond Petitioner's obvious disenchantment with the ALJ's granting relief to Zepeda, I see no reason to overrule our precedent. Similarly, the ALJ's finding that Zepeda was a covered maritime worker was well supported by precedent. For the reasons above, I am satisfied that no changes to the maritime industry or other societal forces compel the conclusion that our precedent as to situs should be overturned or that we should construct a new test for determining status.